# United States Court of Appeals
## For the First Circuit

No. 13-1888

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ TIRU-PLAZA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jay A. García-Gregory, U.S. District Judge]

Before

Torruella, Dyk,[*] and Kayatta,
Circuit Judges.

K. Hayne Barnwell, with whom Rebecca A. Jacobstein, Office of
Appellate Advocacy, was on brief, for appellant.
John A. Mathews II, Assistant United States Attorney, with
whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, were on brief, for appellee.

September 9, 2014

_____

[*] Of the Federal Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** Defendant-Appellant José Tiru-Plaza ("Tiru") appeals from the district court's denial of his motion to suppress the firearm discovered when a police officer pat-frisked him during a traffic stop.

After stopping a car -- in which Tiru was a passenger -- for a traffic infraction, officers from the Puerto Rico Police Department, evidently suspecting that the car might have been stolen, ordered the driver to exit the vehicle and open the hood to permit inspection of the vehicle identification number (the "VIN") stamped on the engine block. When the driver complied, the movement revealed a gun tucked into his waistband. The officers then detained the driver, ordered Tiru to exit the vehicle, and pat-frisked him, revealing a firearm hidden in Tiru's waistband. Subsequently, Tiru was placed into custody and charged with being a felon in possession of a firearm. He sought to suppress the gun as the fruit of an illegal search. The district court denied Tiru's motion, and he now appeals. Concluding that the officers had an objectively reasonable basis to frisk Tiru, we affirm.

## I.  Background

**A.  The Traffic Stop and Frisks**

We present the facts as found in the evidentiary hearing and in the matter "most compatible" with the district court's ruling, consistent with record support.  See United States v.

-2-

McGregor, 650 F.3d 813, 816 (1st Cir. 2011) (citing United States v. Dancy, 640 F.3d 455, 457-58, 460-61 (1st Cir. 2011)).[1]

On March 10, 2012, at around 11:00 p.m., Officers José Casiano-García ("Officer Casiano") and Edwin Martínez-Vargas ("Officer Martínez") spotted a Mitsubishi Lancer driving down a road in Yauco, Puerto Rico. The car's driver, Jenson Morales-Ramos ("Morales"), was accompanied by Tiru and two young women. The officers -- seeing the metal glint of a disengaged buckle over Morales's shoulder -- concluded that the car's occupants were not wearing seat belts.

When the officers turned on their lights to signal that the car should pull over, Morales failed to stop immediately.[2] After traveling only a short distance, and without speeding up or taking evasive action, however, he obeyed the officers' command. After approaching the vehicle, Officer Casiano asked Morales for his driver's license and registration. Morales could not provide a driver's license, and he handed the officer a photocopy of the

---

[1]  Though Tiru disputes some of these facts, "[w]e summarize the facts as found by the district court in its denial of [the defendant's] motion to suppress, which are consistent with record support and are not clearly erroneous," and "[w]e supplement that description with testimony from the record." Dancy, 640 F.3d at 458 (internal citations omitted).

[2]  The highway did not have a shoulder, and Morales continued to drive until the first available exit.

car's original registration[3] on which the VIN could not be made out. The illegible registration and failure to provide a license gave rise to some suspicion that the car may have been stolen.[4] On that basis, Officer Casiano asked Morales to exit the vehicle and open the hood for purposes of inspecting the VIN on the car's engine. When Morales obliged, the resulting movement caused his shirt to lift up and revealed a green pistol grip in his waistband.

Seeing the gun, Officer Casiano yelled "arma"[5] and ordered Morales to place his hands on the hood of the vehicle. Having been alerted to the presence of a firearm by his partner, Officer Martínez ordered Tiru to exit the vehicle and submit to a pat-frisk. When Officer Martínez ran his hands along Tiru's waist he felt a hard object that he believed could be a weapon, inserted two fingers under his waistband, and extracted a black pistol. Tiru was then taken into police custody. After the arrival of two

---

[3]  Morales had borrowed the vehicle while his own car was being repaired. The car's owner, who ran a rental business, explained that he always keeps original registrations on file in his office and places copies in his rental vehicles.

[4]  Although the officers testified that their suspicions were further raised because the VIN on the car's doorjamb had been removed, this testimony was not credited by the district court. Tiru introduced photos, taken after his arrest, showing an intact, 17-character VIN on a painted white surface.

[5]  In English, "weapon."

more police officers, the female passengers were also detained, although they were later released without charges.[6]

**B.  Denial of Tiru's Motion to Suppress His Firearm**

Tiru was indicted for being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  He filed a motion to suppress the firearm evidence, principally arguing that: (1) the officers lacked any reasonable suspicion to stop the vehicle or to order Morales to open the hood, requiring suppression of the gun as fruit of an unlawful search; and (2) even if the initial stop and subsequent frisk of Morales were legal, the officers lacked any reasonable suspicion that Tiru was dangerous or engaged in criminal activity, making his pat-frisk unlawful.

The case was referred to a magistrate judge, who held an evidentiary hearing on October 29, 2012.  The magistrate judge's report and recommendation concluded that the initial traffic stop was lawful, and that Tiru lacked standing to challenge the legality

---

[6]  One of the car's female passengers offered testimony for the defense contradicting the officers' version of events in certain respects.  She stated that after the officers approached the car and asked for Morales's license and registration, they asked Morales if he "liv[ed] out there" -- presumably referencing a nearby public housing project.  The officers then pulled out their weapons, ordered all four occupants from the car, and frisked Morales.  An officer "st[]uck his hand down [Morales's] pants, and he pulled out a gun, and he started shouting "[g]un."  Another two officers arrived in a separate patrol car, and "they searched [Tiru]."  Thus, the testimony offered by the defense, though differing in some respects from the government's narrative, was consistent with the government's evidence that Tiru was pat-frisked only after the officers discovered Morales's firearm.

of the officer's attempt to search under the vehicle's hood. However, the magistrate judge ultimately found that, under a totality-of-the-circumstances test, there was no objectively reasonable basis to suspect that Tiru was armed or dangerous. The report therefore recommended suppression.

The district court disagreed with the magistrate judge's conclusion as to the totality of the circumstances surrounding Tiru's pat-frisk. The district court found that certain "facts are undisputed in this case": the young age[7] and number of occupants in the car (four); the late hour (11:00 p.m.); Morales's failure to immediately pull over and stop the car when prompted to do so by the police officers; and the discovery of Morales's gun. On the basis of these factors, the district court found an objectively reasonable basis for the officer's frisk of Tiru. The court thus denied the motion to suppress.

Tiru pleaded guilty to being a felon in possession of a firearm and was sentenced to thirty-three months' imprisonment and a supervised-release term of three years. Nevertheless, he reserved the right to seek appellate review of the district court's decision to deny suppression. He now exercises that right.

---

[7] Officer Casiano testified that Morales, the driver, was "a young man," and that one of the female passengers was "a young lady." Officer Martínez also testified that Morales was "[a]nother young man."

## II. **Discussion**

On an appeal from a denial of a motion to suppress, our review of the district court's decision is bifurcated. First, factual conclusions and credibility determinations are reviewed only for clear error. United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011). Under this clear-error review, we grant significant deference to the district court, overturning its findings only if, after a full review of the record, we possess "a definite and firm conviction" that a mistake was made. McGregor, 650 F.3d at 820 (citing United States v. Woodbury, 511 F.3d 93, 96 (1st Cir. 2007)); see also United States v. Cruz-Jiménez, 894 F.2d 1, 7 (1st Cir. 1990) ("Where there are two competing interpretations of the evidence, the district court's choice of one of them cannot be clearly erroneous.").

Second, in contrast, we review legal conclusions -- including the district court's probable cause and reasonable suspicion determinations, as well as its ultimate decision to grant or deny the motion to suppress -- de novo. Camacho, 661 F.3 at 723; United States v. Crespo-Ríos, 645 F.3d 37, 41 (1st Cir. 2011). In assessing these legal conclusions, however, we also give appropriate weight to the inferences drawn by the district court and the on-scene officers, recognizing that they possess the advantage of immediacy and familiarity with the witnesses and events. See United States v. Dapolito, 713 F.3d 141, 147 (1st Cir.

2013) (citing <u>Ornelas</u> v. <u>United States</u>, 517 U.S. 690, 698-99 (1996)); <u>United States</u> v. <u>Smith</u>, 423 F.3d 25, 35 (1st Cir. 2005) ("De novo review in this particular context is not unmindful of the district court's reasoning (nor the reasoning of the officers) . . . .").

## A. The Fundamentals: the Fourth Amendment and <u>Terry</u> Stops

The Fourth Amendment protects an individual's right to be free from unreasonable searches and seizures by the government. <u>See</u> U.S. Const. amend. IV; <u>see</u>, <u>e.g.</u>, <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1, 9 (1968) (quoting <u>Elkins</u> v. <u>United States</u>, 364 U.S. 206, 222 (1960)). Warrantless searches are <u>per</u> <u>se</u> unreasonable, unless they fall within a well-defined and specifically enumerated exception to the warrant requirement. <u>See</u> <u>Coolidge</u> v. <u>New Hampshire</u>, 403 U.S. 443, 454-55 (1971); <u>see also</u> <u>Camacho</u>, 661 F.3d at 724 (citing <u>Arizona</u> v. <u>Gant</u>, 556 U.S. 332, 338 (2009)). The Fourth Amendment's protection is ensured by, among other means, the exclusionary rule, which in certain circumstances requires suppression of evidence that is the product of an unlawful search or seizure. <u>See</u>, <u>e.g.</u>, <u>Terry</u>, 392 U.S. at 12; <u>Camacho</u>, 661 F.3d at 724.

Included in the Fourth Amendment's protective ambit are <u>Terry</u> stops -- those "brief investigatory stops of persons or vehicles that fall short of traditional arrest." <u>United States</u> v. <u>Arvizu</u>, 534 U.S. 266, 273 (2002); <u>see also</u> <u>Camacho</u>, 661 F.3d at 724 ("The protections of the Fourth Amendment apply not only to

traditional arrests, but also to those brief investigatory stops generally known as Terry stops."); United States v. Chhien, 266 F.3d 1, 5 (1st Cir. 2001) (recognizing that a traffic stop constitutes a Fourth Amendment seizure of both the vehicle and its occupants (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)). Such stops are reasonable, and consequently do not offend the Fourth Amendment, only where officers have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry, 392 U.S. at 30)); Camacho, 661 F.3d at 724-25 (describing the reasonable suspicion required to validate a Terry stop). During a valid Terry stop, a police officer may perform pat-frisks or search a car's interior for weapons if the officer "has some articulable, reasonable suspicion that the persons stopped may be dangerous." McGregor, 650 F.3d at 820; see also United States v. Ruidíaz, 529 F.3d 25, 32-33 (1st Cir. 2008) (holding that, during a traffic stop and when an officer has concern for his own safety, the officer may "order a passenger out of the car as a security measure" and may perform a protective pat-down once he "has formed a reasonable belief that a detained person may be armed and dangerous").

Reasonable suspicion is a less exacting requirement than probable cause, but requires "something more than an inchoate and unparticularized suspicion or 'hunch.'" Sokolow, 490 U.S. at 7

(quoting Terry, 392 U.S. at 27) (internal quotation marks omitted); see also Chhien, 266 F.3d at 6 (same). In determining whether reasonable suspicion existed, we apply an objective standard, rather than assessing the subjective intent of an individual officer, and we appropriately consider the "totality of the surrounding circumstances." Ruidíaz, 529 F.3d at 29.

This reasonableness inquiry deals with "degrees of likelihood, not . . . certainties or near certainties," United States v. Arnott, No. 13-1881, 2014 WL 2959288, at *3 (1st Cir. July 2, 2014), and ultimately we must make a "practical, commonsense judgment" based on the intricacies of each case. Chhien, 266 F.3d at 6. In so doing, we appropriately grant respect to the ability of trained and experienced police officers[8] to draw from the attendant circumstances inferences that would "elude an untrained person." United States v. Cortez, 449 U.S. 411, 418 (1981); see also Ruidíaz, 529 F.3d at 29 (same). We also seek to "balance 'the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.'" Chhien, 266 F.3d at 6 (quoting United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998)).

---

[8] At the suppression hearing, Officer Casiano testified that he had worked as a police officer for eighteen years; Officer Martínez testified that he had worked for the Puerto Rico Police Department for approximately seventeen years and six months.

-10-

Arguing that evidence of his firearm should have been suppressed, Tiru principally levies three interrelated arguments. First, Tiru asserts that the police illegally extended his detention when they ordered Morales, the driver, to open the hood of the car. Second, he maintains that the gun was discovered when the police searched him pursuant to an unlawful arrest. Third, he argues that the police officers were not justified in pat-frisking him pursuant to a valid Terry stop because none of the factors that the district court relied upon were particular to him. We address each argument in turn.

## B. Did the Police Illegally Extend Tiru's Detention by Ordering Morales to Open the Hood of the Car?

Tiru argues that the police officers unlawfully extended his detention during the traffic stop by searching under the hood.[9] See, e.g., United States v. Acosta-Colón, 157 F.3d 9, 14 (1st Cir. 1998) ("Terry was intended to carve out an exception to the probable cause requirement only for relatively brief, non-arrest detentions; plainly, a seizure that is, de facto, tantamount to an arrest cannot fit within that exception."). In assessing whether

---

[9] On appeal, Tiru does not dispute the district court's determination that he lacked standing to challenge any search of Morales's person or of the car itself. See, e.g., Rakas v. Illinois, 439 U.S. 128, 148-49 (1978) (establishing that a vehicle's passenger generally does not have an expectation of privacy over areas like a car's glove compartment, trunk, or under-seat area). Instead, Tiru argues that the police illegally extended the traffic stop as to Tiru himself when they asked Morales to open the hood of the car.

-11-

the duration of a <u>Terry</u> stop is so long that it becomes unlawful, there is no bright-line rule. <u>United States</u> v. <u>Pontoo</u>, 666 F.3d 20, 30 (1st Cir. 2011) (citing <u>Florida</u> v. <u>Royer</u>, 460 U.S. 491, 506-07 (1983)). Rather, we apply a totality-of-the-circumstances approach, considering, among other things, "the length of the detention, the restrictions placed on an individual's personal movement, the force (if any) that was exerted, the information conveyed to the detainee, and the severity of the intrusion." <u>Sowers</u>, 136 F.3d at 28.

Morales failed to provide the police officers with a driver's license and a legible car registration.[10] Under these circumstances, it was reasonable for the officers to suspect that the car might have been stolen. <u>See</u> <u>Terry</u>, 392 U.S. at 27 (allowing officers to rely on "reasonable inferences . . . draw[n] from the facts in light of [their] experience"). Based on that suspicion, Officer Casiano asked Morales to get out of the car and open the hood, in order to check the VIN on the car's engine and compare it with the VIN number on the dashboard. This would enable the officer to determine whether there was an inconsistency between the numbers, indicating a stolen car, or to check the VIN numbers

---

[10] The district court did not make an express determination regarding whether the registration was in fact illegible, but we view the record in light most favorable to the court's ruling on suppression. <u>See</u> <u>Arnott</u>, 2014 WL 2959288, at *4 ("Although the district court made no express findings on this point, we must view the record and the reasonable inferences extractable therefrom in the light most favorable to the court's suppression ruling.").

-12-

with a stolen vehicles database. The officers' suspicion eventually led them to send the car to the police department's Stolen Vehicles Division for inspection.

Tiru's argument focuses on the duration of the stop; he suggests that the time it took to have Morales open the hood unreasonably elongated the initial Terry stop.[11] We cannot agree. "The appropriate length of a Terry stop is gauged by whether the officer diligently pursued a reasonable investigative approach calculated to ensure officer safety and, at the same time, confirm or dispel his suspicions." Pontoo, 666 F.3d at 31. Here, although nothing in the record describes the precise length of time it took for Morales to exit the vehicle, approach its front, and open the hood, no reasonable reading of the facts could allow us to conclude that the duration of time in which these events occurred was anything but brief. Cf. United States v. Owens, 167 F.3d 739, 748-49 (1st Cir. 1999) (finding a fifty-five-minute Terry stop reasonable under the circumstances).

Moreover, whatever its length, this sequence of events occurred immediately after the officers began to suspect that the car might be stolen, and it was a "reasonable investigative approach" intended to dispel that suspicion. Flowers v. Fiore, 359

---

[11] We note that the other relevant factors, such as the degree of police intervention, cut strongly against Tiru's claim. During the time that Morales exited the car and sought to open the vehicle's hood, Tiru remained in the back seat and was not subject to any officer intervention.

F.3d 24, 31 (1st Cir. 2004) (holding the duration of a stop to be reasonable where the officers diligently sought to dispel their suspicions); cf. United States v. Place, 462 U.S. 696, 703 (1983) (balancing the intrusiveness of a search against the governmental interest served); United States v. Ware, 457 F.2d 828, 829 (7th Cir. 1972) (validating a search under the hood "where the officer has a legitimate reason to identify the automobile"); United States v. Dadurian, 450 F.2d 22, 25 (1st Cir. 1971) (finding a "reasonable ground" to inspect a VIN under an engine based on a discrepancy between the vehicle's two visible VINs).  Therefore, this argument necessarily fails, and we find that the officers did not unlawfully extend Tiru's detention.

## C.  Was Tiru Searched Pursuant to an Unlawful Arrest?

Tiru next argues that the pat-frisk conducted by Officer Martínez was not a Terry frisk at all, but rather was a search incident to an unlawful arrest.  Citing testimony from Officer Martínez, Tiru claims that after discovering Morales's gun the officers immediately placed all of the vehicle's occupants under arrest, despite the absence of probable cause that he or the female passengers had engaged in a crime.[12]  Tiru bases this argument

---

[12]  This argument was not directly raised before the district court, which is a proper grounds for waiver.  See, e.g., United States v. Oquendo-Rivas, 750 F.3d 12, 16-17 (1st Cir. 2014).  Because the government did not raise a claim of waiver, however, we skip over any possible waiver argument and we treat the claim on its merits. See Knight v. United States, 37 F.3d 769, 772 n.2 (1st Cir. 1994) ("[A]s the government has not objected on this ground, and as the

entirely on Officer Martínez's testimony in response to being asked why he frisked Tiru; Martínez replied that after his partner discovered a firearm on Morales "everyone in the vehicle [was] placed under arrest."  Tiru's argument on this point fails to persuade.

Whatever the intended meaning of Officer Martínez's statement, the facts do not support a claim that Tiru was placed under arrest prior to being frisked.  After the discovery of Morales's firearm, the progression of events -- as explicitly found by the district court -- was as follows: Tiru was asked to step out of the vehicle, while the two female passengers remained inside; Officer Martínez pat-frisked Tiru; the frisk revealed a weapon; and only then was Tiru handcuffed and detained.  See Camacho, 661 F.3d at 723 (recognizing that factual findings related to a motion to suppress are reviewed by our court only for clear error).  These facts do not support the claim that, prior to the frisk of Tiru, he was placed under formal or even de facto arrest by Officer Casiano.

We have held that there is no "scientifically precise formula" demarcating the line between investigatory Terry stops and a de facto arrest.  United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994).  Instead, we have said that "a de facto arrest occurs when 'a reasonable man in the suspect's position would have

_____

claim fails in any event, we overlook that it was not raised below.").

understood his situation . . . to be tantamount to being under arrest.'" United States v. Jones, 700 F.3d 615, 624 (1st Cir. 2012) (quoting Zapata, 18 F.3d at 975). As outlined above, the facts here do not meet that standard. Prior to the discovery of Morales's gun, Tiru was seated in the back seat of the car during a traffic stop for a traffic violation -- we do not think that a reasonable person in Tiru's position would have considered himself to be under arrest at that time. See id. Nor do we think that, in the brief instant between the discovery of Morales's gun and the pat-frisk of Tiru, a reasonable person in Tiru's shoes would have considered himself to be under arrest. See id. Therefore, we turn to examine the validity of the initial Terry stop and the reasonableness of the officers' actions thereafter.

**D. The Terry Stop and Subsequent Pat-Frisk of Tiru**

Our review of an investigatory Terry stop proceeds in two steps. First, we assess whether the stop was "justified [by reasonable suspicion] at its inception." Pontoo, 666 F.3d at 26. Second, we ask whether the officers' actions during the stop bear a reasonable relationship to the circumstances originally justifying the stop. United States v. Henderson, 463 F.3d 27, 45 (1st Cir. 2006). Within this second step, we recognize that information gained subsequent to the initial stop may provide a "'basis for expanding [the officers'] investigation.'" Id.; Chhien, 266 F.3d at 6 ("[W]hile an officer's actions must bear some

-16-

relation to the purpose of the original stop, he may shift his focus and increase the scope of his investigation by degrees if his suspicions mount during the course of the detention."); Sowers, 136 F.3d at 27 (requiring that "the actions undertaken by the officer following the stop [be] reasonably responsive to the circumstances justifying the stop in the first place, as augmented by information gleaned by the officer during the stop").

### 1. Legitimacy of the Initial Terry Stop

Although he disputed this fact in his motion to suppress, Tiru's appeal does not challenge the district court's factual determination that the car's occupants were not wearing their seat belts. We agree with the district court's determination that this traffic infraction was sufficient to justify the initial stop. See Whren v. United States, 517 U.S. 806, 819 (1996) ("[T]he officers had probable cause to believe that petitioners had violated the traffic code. That rendered the stop reasonable under the Fourth Amendment . . . ."); McGregor, 650 F.3d at 820 ("An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else."); Chhien, 266 F.3d at 6 ("[T]he appellant does not question the legitimacy of the initial detention: [the officer] clearly had cause to stop him for tailgating and operating an automobile equipped with blue-tinted lights.").

## 2. Reasonableness of the Officer's Subsequent Actions

Resolution of this case rests on determining whether the officers' actions subsequent to the initial stop, which culminated in Tiru's pat-frisk, were a reasonable investigatory response intended to dispel suspicions related to the evolving circumstances of that stop. See Ruidíaz, 529 F.3d at 29 (disavowing a test that treats Terry stops like a "snapshot of events frozen in time and place"); Chhien, 266 F.3d at 6 (allowing for officers to respond reasonably to the "emerging tableau" of facts observed after an initial stop).

To begin, it is clear that the officers' request that Morales exit the vehicle was permissible. Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977) ("We hold only that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures."); United States v. Coplin, 463 F.3d 96, 102 (1st Cir. 2006) ("[A] police officer may, as a matter of course, require the driver of a car lawfully stopped for a suspected traffic violation to step out of his vehicle." (citation omitted)).

Similarly, the officers' request for Tiru to exit the vehicle was also permissible. Given the scope of Tiru's appeal, we appropriately focus on the events occurring subsequent to the

officers' request to view the engine. When Morales attempted to open the vehicle's hood, Officer Casiano noticed that Morales had a visible gun in his waistband. In light of this discovery, Officer Martínez's request that Tiru exit the vehicle was reasonable and was responsive to the needs of officer safety. Ruidíaz, 529 F.3d at 32 ("When a Terry stop is effected in connection with a traffic violation and an officer's concern for his own safety is implicated, it is within the officer's authority to order a passenger out of the car as a security measure."); see also Maryland v. Wilson, 519 U.S. 408, 414-15 (1997) (holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop," because "the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver" and that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car"); McGregor, 650 F.3d at 820 (stating that an officer conducting a traffic stop can "order the occupants out of the auto"). Indeed, Officer Martínez testified that when Officer Casiano yelled, "weapon," Martínez "immediately feared for my life and for the life of my fellow officer, and for the lives of the people in the car."

Tiru and the government disagree about whether the subsequent pat-frisk was undergirded by a reasonable suspicion that

-19-

Tiru was dangerous. See McGregor, 650 F.3d at 820 (allowing for officers to pat-frisk a car's occupants after a traffic stop when there is an "articulable, reasonable suspicion that the persons stopped may be dangerous"); Pontoo, 666 F.3d at 30 ("In a world fraught with peril, officer safety must have a place at the forefront of police work. It follows logically that a pat-frisk may accompany an investigatory stop whenever an officer has reason to believe that the suspect is armed and dangerous." (internal quotation marks and citation omitted)).

Tiru asserts that the district court's denial of his motion to suppress relied only on general or environmental factors -- for example, his youth and the time of night -- that lacked all bearing to Tiru specifically. In Tiru's estimation, reliance solely on these facts is an insufficient ground for a search, and it reveals a telling absence of any reasonable suspicion that he was dangerous. Tiru claims that his frisk was necessarily unreasonable, as any suspicion was based merely on his proximity to Morales. In support of this position, Tiru asks us to reject what he deems to be a "theory of guilt by association," relying on the Supreme Court's decision in Ybarra v. Illinois, 444 U.S. 85 (1979), for the proposition that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Id. at 91.

Ybarra, however, is readily distinguished from the case at bar.  In Ybarra, the police officers "knew nothing in particular about" the defendant prior to pat-frisking him, "except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale."  Id.  No firearms or other weapons were found prior to the frisk of Ybarra.  Id. at 87-89.  Other than their mere presence in the same bar, there were no facts connecting Ybarra to the bartender suspected of selling heroin.  Id.  Under those circumstances, the Supreme Court held that "[t]he initial frisk of [the defendant] was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons."  Id. at 92-93.

Here, we are confronted with markedly different circumstances than those presented in Ybarra.  Viewing the facts of the instant case in their totality, we are unconvinced by Tiru's argument.  We recapitulate briefly: during the night, two officers found themselves having stopped four individuals in a car that the officers had some reason to believe might be stolen.  The officers then discovered that the driver had a firearm concealed in his waistband.  Objectively, this situation gives rise to a reasonable concern for officer safety -- the officers were outnumbered, in relative darkness, and could reasonably believe that they were

-21-

dealing with the volatile situation of a possible car theft.  See Wilson, 519 U.S. at 414 ("It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop.  And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver."); see also United States v. Brake, 666 F.3d 800, 805-06 (1st Cir. 2011) ("We emphasize once again the importance of police officer safety during a Terry stop . . . .").

Certainly, facts like the late hour (11:00 p.m.) and number of passengers in the car (four), when each is taken alone, create no suspicion of criminal activity.  But a number of innocuous facts viewed together may form the basis of reasonable suspicion.  See United States v. Wright, 582 F.3d 199, 212 (1st Cir. 2009); Ruidíaz, 529 F.3d at 30.  And although Morales's inability to provide the officers with a driver's license and a legible car registration could admit of several potentially innocent explanations, these facts might also reasonably give rise to a suspicion of criminal activity.  See Terry, 392 U.S. at 27 (permitting police officers to draw "reasonable inferences" based on their experience); Arnott, 2014 WL 2959288, at *3 (stating that "reasonable suspicion . . . deals with degrees of likelihood, not with certainties or near certainties," and allows "police officers

-22-

to draw upon their experience and arrive at inferences and deductions").

Finally, although the discovery of a driver's dangerousness may not, in every case, create reasonable suspicion that a passenger has a gun, it would be beyond folly for our court to ask police officers to ignore the clear relevance of discovering a hidden firearm on the driver. Moreover, in this case, consideration of that discovery in no way offends the rule of Ybarra. Compare Wyoming v. Houghton, 526 U.S. 295, 304-05 (1999) ("[A] car passenger -- unlike the unwitting tavern patron in Ybarra -- will often be engaged in a common enterprise with the driver, and have the same interest in concealing the fruits or the evidence of their wrongdoing."), with Ybarra, 444 U.S. at 93 (finding, when police officers knew nothing about the defendant beyond his presence in a tavern where the bartender was suspected of selling heroin, that the officers lacked any particular reason to suspect that he was armed and dangerous, as required to justify a frisk).

Reasonable suspicion is ultimately a pragmatic inquiry -- one that "must be based on commonsense judgments and inferences about human behavior." Illinois v. Wardlow, 528 U.S. 119, 125 (2000). Assessing the totality of the circumstances in this case, the officers' decision to pat-frisk Tiru was grounded in a reasonable suspicion that he might be armed and dangerous. The circumstances of the stop, and the facts discovered during its

-23-

progression, sufficed to provide a "specific and articulable" basis for the decision to pat-frisk Tiru in order to ensure that he did not pose a direct threat.  See, e.g., United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007) (stating that the "particularity requirement" underlying our test for reasonableness requires that a search be "'grounded in specific and articulable facts.'" (quoting United States v. Hensley, 469 U.S. 221, 229 (1985)).

The pat-frisk surely represented a "serious intrusion" upon Tiru's privacy.  See Terry, 392 U.S. at 17.  It was limited in scope, however, only to the "bare minimum needed to detect the presence of a firearm" -- Officer Martínez began the pat-frisk at Tiru's waist and, upon feeling a hard object, extracted it with two fingers.  See United States v. Romain, 393 F.3d 63, 72 (1st Cir. 2004) (finding a frisk "reasonable under the circumstances and, thus, constitutionally appropriate," when "the police had a plausible basis for suspecting that the appellant was armed and dangerous," and the subsequent frisk "began at the appellant's waist" and was not more invasive than necessary to determine whether the defendant had a gun).  In light of the important interest in officer safety, and the facts buttressing the officers' belief that Tiru might pose a danger, we find that this significant but brief intrusion was supported by reasonable suspicion.  See Sowers, 136 F.3d at 27 (requiring a balance between the "quality of

the intrusion" and the "importance of the governmental interests alleged" (quoting <u>Hensley</u>, 469 U.S. at 228)).

### III. <u>Conclusion</u>

The totality of the circumstances in this case indicate that the officers had reasonable suspicion to pat-frisk Tiru. We therefore affirm the district court's denial of Tiru's motion to suppress the firearm.

**<u>Affirmed</u>**.