# United States Court of Appeals
## For the First Circuit

No. 19-1461

UNITED STATES OF AMERICA,

Appellee,

v.

RUBEN GONZALEZ, a/k/a CARLOS ARNALDO DELGADO TORRES, a/k/a
RODRIGUEZ, a/k/a LUIS COLON, a/k/a JORGE RODRIGUEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Lipez, and Barron,
Circuit Judges.

Lenore Glaser for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with
whom Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

October 20, 2021

**LIPEZ**, **Circuit Judge**.  Appellant Ruben Gonzalez was charged with three drug trafficking offenses after law enforcement officers discovered cocaine and heroin inside his vehicle. Gonzalez moved to suppress the drugs as the fruits of an unlawful seizure.  After a three-day evidentiary hearing, a magistrate judge recommended that Gonzalez's motion be denied.  The district court judge adopted that recommendation.  In November 2018, a jury convicted Gonzalez on all counts.  Gonzalez appeals, arguing only that the district court erred in denying his motion to suppress. We affirm the district court, but on a different ground apparent from the record.  See Saccoccia v. United States, 955 F.3d 171, 172 (1st Cir. 2020) ("[W]e are free to affirm on any grounds made manifest by the record . . . .").

## I.

When reviewing the denial of a motion to suppress, we recite "the facts as . . . found by the court below, including any inferences drawn by the court from the discerned facts."  United States v. Crooker, 688 F.3d 1, 3 (1st Cir. 2012).  Here, we recount the facts as found by the magistrate judge and adopted by the district court.

### A. The Investigation

In June 2013, federal agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and the Drug Enforcement Administration ("DEA") were investigating the alleged drug

trafficking and money laundering activities of several individuals in and around Boston. Agents used physical surveillance, GPS tracking, and cell phone communications intercepted from one of the targets of the investigation, Roberto Mejia. Agents suspected that Mejia was the leader of a major drug distribution organization in Boston that was supplied by his brother, Enrique Mejia ("Clasico"), who lived in Sinaloa, Mexico.

In October 2013, agents observed Mejia and his female companion purchase a Chrysler Sebring. Mejia paid for the vehicle in cash, but the car was registered in his companion's name. A few days later, Mejia dropped off the car at an auto-body shop in Lawrence, Massachusetts, where, based on intercepted communications, officers believe he had arranged for the installation of a "hide" (a hidden compartment that is typically used to conceal drugs and other contraband for transport). After Mejia picked up the vehicle, he drove it to a residence at 32 Shaw Street in West Roxbury, Massachusetts. There was also a Nissan Versa, owned by Mejia, often parked at 32 Shaw Street.[1] Based on utility information obtained via administrative subpoena and physical surveillance, agents suspected that 32 Shaw Street was a stash house used by Mejia to store narcotics and other contraband.

---

[1] Court-approved tracking devices were affixed to both the Sebring and the Versa.

## B. Interactions Between Mejia and Gonzalez

From November 20 to November 26, 2013, agents intercepted several phone calls between Mejia and a number later discovered to belong to Gonzalez.[2]  Agents initially labeled the unknown caller as "UM-9271"[3] and did not learn that UM-9271 was Gonzalez until after he was arrested on November 26, 2013.

During the calls, Mejia and Gonzalez discussed the location, timing, and other aspects of an upcoming shipment of narcotics to New York City, using coded language.[4]  Gonzalez also disclosed during those calls that, on several occasions, he had been in direct communication with the Mexican supplier, Clasico. For example, on November 21, 2013, agents intercepted a call between Mejia and Gonzalez during which Gonzalez relayed a message from Clasico warning Mejia that when he went to retrieve the

---

[2] Appellant's given name is Edwin Radeymi Soto Castillo, but he has apparently been using the name Ruben Gonzalez in the United States for at least 17 years.  We will refer to appellant as Ruben Gonzalez.  That is the name from his conviction papers, and he used that name in his brief to this court.

[3] UM stands for "unidentified male" and 9271 represents the last four digits of Gonzalez's phone number.

[4] For example, ATF Special Agent John Hayes testified that, based on his experience in narcotics trafficking, when Mejia and Gonzalez referred to the "political party" or the "campaign" in their conversations, they were discussing their drug distribution network; references to the "white party" meant cocaine; and any discussions about "Alex Rodriguez," who played for the New York Yankees at the time, meant that the relevant shipment was going to be transported to New York City.

shipment from New York, he "should not trust anybody. . . . [And] [t]o check and go around a few times before," which agents understood to mean that Mejia should conduct countersurveillance to ensure he was not being followed.[5]  Gonzalez also encouraged Mejia, saying, "I know we . . . have to struggle a little bit at first, but when the 'political party' gets going and stuff, we are going to be first in all this area."  In another call a few days later, Gonzalez told Mejia that he had spoken to Clasico again and asked Mejia to give to Gonzalez "everything [he could] throw to [him] . . . . The most product you can, you give out what you're going to give out."  Mejia responded, "Yes, as soon as it arrives I'll call you, alright."

On November 25th, agents intercepted a call between Gonzalez and Mejia in which the pair discussed Mejia "getting ready . . . to do the deal."  That evening, and into the early morning hours of November 26th, GPS location data revealed that Mejia drove the Sebring to the Bronx, then to a location in New Jersey, and finally back to Massachusetts.  At approximately 8:00 a.m., agents observed Mejia arrive in the Sebring at 32 Shaw Street, park, and

---

[5] The magistrate judge attributed these statements to Mejia in the Report and Recommendation, but that appears to be an error. The transcript of the suppression hearing reveals that it was Gonzalez, not Mejia, who conveyed the warning not to trust anyone and to engage in countersurveillance.  The confusion likely stems from the fact that Gonzalez was conveying to Roberto Mejia a warning that came from Mejia's brother, Enrique Mejia (Clasico).

enter the residence. The Sebring was eventually moved into the garage, which was attached to the residence. Agents did not observe Mejia carrying any packages, but twenty minutes after he arrived, agents intercepted a call with a number believed to belong to Clasico, in which Mejia reported "[e]verything is here now," and confirmed that he had "grabbed 14 and . . . count[ed] them well."[6]

Later that day, agents intercepted a series of calls between Mejia and Gonzalez about meeting at an outdoor shopping mall in Dedham, Massachusetts, called "Legacy Place." Gonzalez and Mejia planned to arrive at Legacy Place in two separate cars. They agreed that after spending time walking around the mall, they would leave together in one vehicle. At around 4:00 p.m., Mejia left 32 Shaw Street in his Versa. While on his way, Mejia told Gonzalez that he would be late because he had to make "fuin fuan," which agents took to mean countersurveillance. He apologized to Gonzalez, explaining, "I'm sorry but I have to do it like this. I was on my way but I'm checking if someone is behind. We have to check, you know." A surveillance team followed and observed him making several stops. Mejia arrived at Legacy Place in his Versa about twenty minutes after Gonzalez had arrived in a Toyota Sienna.

---

[6] Officers ultimately recovered approximately fourteen kilograms of cocaine from Mejia and Gonzalez.

Mejia and Gonzalez walked around Legacy Place for about thirty minutes. Agents observed them entering and exiting stores, at least one restaurant, and bathrooms, and concluded that they were conducting countersurveillance. Eventually, Gonzalez and Mejia got into Gonzalez's Sienna and drove off, leaving Mejia's Versa in the parking lot. Although officers followed the Sienna, they lost the vehicle shortly after it left the mall. While the agents were waiting for Gonzalez and Mejia to return to 32 Shaw Street, nine or ten law enforcement vehicles assembled in the area.[7] Also during that interim, agents sought and obtained search warrants for 32 Shaw Street and Mejia's Sebring from a magistrate judge.

## C.  The Vehicle Containment

At approximately 11:00 p.m., officers observed the Sienna arrive back at 32 Shaw Street. Mejia and Gonzalez exited the vehicle and went inside. About thirty minutes later, Mejia and Gonzalez emerged from the residence and got back into Gonzalez's Sienna, with Gonzalez driving and Mejia riding in the front passenger seat. It was dark outside, and "there was no indication that officers saw either Mejia or [Gonzalez] carrying a package."

---

[7] ATF and DEA agents, as well as state and local police officers, were present. We refer to the members of the agencies involved collectively as "agents," "officers," or "law enforcement."

Special Agent James Connolly determined that the safest way to execute the search warrant for the residence was first to conduct a "vehicle containment" of Gonzalez's Sienna and detain Gonzalez and Mejia.[8] Hence, agents blocked the Sienna's path with the intent to force Gonzalez to stop the vehicle so that he and Mejia could be detained while the search warrants were executed. When the front bumpers of Connolly's vehicle and the Sienna touched, the Sienna came to a stop. As Connolly and his team of agents approached the Sienna on foot, Gonzalez accelerated the car in reverse, striking another police vehicle that was positioned behind the Sienna and travelling about 30 yards before crashing into a civilian vehicle and coming to a stop.

Mejia was taken into custody without incident. Gonzalez, on the other hand, did not cooperate and was forcibly removed from the vehicle. Once outside the vehicle, Gonzalez continued to resist the officers' attempts to restrain him by, among other things, sitting on his hands. Agents were eventually able to handcuff Gonzalez, but he suffered moderate injuries as a result (e.g., bruising on his face).

---

[8] Agent Connolly testified that he "just didn't feel it would be safe to go [inside]" 32 Shaw Street because he did not know how many individuals were in the home or whether they had any weapons, and "gain[ing] entrance by force . . . would have given [Mejia and Gonzalez] a heads-up to indicate that [officers] were outside trying to gain entrance."

After both Mejia and Gonzalez were placed in handcuffs and detained, an agent went to the driver's side of the Sienna and shifted the gear into "park." Officers testified that they also opened the vehicle's rear sliding door to clear the vehicle of any possible additional occupants. Upon opening the door, officers observed in plain view a black plastic bag containing a "brick-like substance" on the floor behind the front passenger seat. Boston Police conducted a crime scene investigation and, based on field testing, concluded that the black plastic bag contained cocaine and heroin.

After the vehicle was swept, the search warrants for 32 Shaw Street and Mejia's Sebring were executed at approximately 11:35 p.m.[9] Agents recovered a large black bag in the front bedroom closet of 32 Shaw Street that contained approximately thirteen kilograms of cocaine and a bag of heroin. Agents also discovered packaging equipment, including a digital scale, shrink wrap, a can of grease, and a roll of tape.

---

[9] The search warrants initially expired at 10:00 p.m., but the agents received a court-approved extension of time given the late hour that Mejia and Gonzalez arrived back at 32 Shaw Street.

## D. Procedural Background

In a superseding indictment issued in September 2014, Gonzalez and two others[10] were charged with conspiracy to possess with intent to distribute 100 grams or more of heroin and 500 grams or more of cocaine for the drugs recovered both from 32 Shaw Street and Gonzalez's Sienna. Gonzalez was also charged with possession with intent to distribute 100 grams or more of heroin and possession with intent to distribute 500 grams or more of cocaine for the drugs found in his Sienna.

Gonzalez moved to suppress the heroin and cocaine seized from his Sienna.[11] He argued that officers stopped his vehicle

---

[10] The two other defendants were Mejia and one of Mejia's customers (Eric Rivera-Sanchez). Both pled guilty and neither is a party to this appeal.

[11] Gonzalez did not seek to suppress the drugs found inside 32 Shaw Street (presumably because he did not live there, and the drugs were recovered pursuant to a properly executed search warrant). Those drugs are relevant to the conspiracy charge (as are the drugs found in the Sienna), but not the possession charges. The government recognizes that if we were to conclude that the drugs from the Sienna should have been suppressed, we would need to vacate Gonzalez's possession convictions. As to his conspiracy conviction, however, the government argues that, even without the drugs found in the Sienna, there is overwhelming evidence in the record that Gonzalez conspired with Mejia to possess and distribute the drugs found inside 32 Shaw Street and, thus, any error in admitting the drugs found in the Sienna would be harmless as to the conspiracy conviction. Gonzalez asks us to vacate the entirety of the jury verdict without addressing the government's harmless error argument. However, because we conclude that the district court properly denied the suppression motion, we need not consider the government's alternative argument for affirmance of the conspiracy conviction.

without reasonable suspicion in violation of the Fourth Amendment, and, thus, the cocaine and heroin found inside the vehicle were inadmissible.  In response, the government argued that (1) the officers not only had reasonable suspicion, but also probable cause to arrest Gonzalez when they stopped and searched his vehicle; (2) Gonzalez was not seized until he submitted to the officers' show of authority after being forcibly removed from his vehicle and handcuffed; and (3) even if the initial stop was unlawful, Gonzalez's attempted flight constituted a new crime that removed any evidentiary taint.  At the request of the district court judge, a magistrate judge conducted a three-day evidentiary hearing on the motion and thereafter submitted a Report and Recommendation ("R&R") detailing her findings.[12]

## E. The Report and Recommendation

The magistrate judge concluded that (1) the agents reasonably suspected that Mejia and Gonzalez had engaged in a drug transaction and that evidence of that transaction would be found in the Sienna, thereby justifying an investigatory stop of the vehicle; (2) Gonzalez was not seized until he was handcuffed because, until then, he had not submitted to the officers' show of

---

[12] After the first day of the hearing, Gonzalez moved to withdraw his motion to suppress and sought to plead guilty. Shortly thereafter, Gonzalez's counsel withdrew and new counsel was appointed.  The district court judge again referred the motion to suppress to the magistrate judge, who reconvened a hearing on the motion.

- 11 -

authority; (3) Gonzalez's seizure was lawful because his flight escalated the officers' existing reasonable suspicion to probable cause; and (4) the officers had probable cause to search the Sienna.

Gonzalez objected to each of the magistrate judge's findings. The district court overruled his objections but disagreed with the magistrate judge's analysis on two issues. First, the district court concluded that the moment that Gonzalez was "seized" was a "false issue" because the case involved two seizures -- one when the Sienna was stopped and one when Gonzalez was arrested -- both of which occurred after the necessary conditions (reasonable suspicion and probable cause, respectively) were satisfied. Second, the court ruled that there was no need to reach the question of whether the officers had probable cause to search the Sienna because "the contraband was found in plain view in the course of the officers' protective sweep of the van" after Gonzalez's lawful arrest. With those clarifications, the district judge adopted the R&R and denied Gonzalez's motion to suppress. A jury subsequently convicted Gonzalez on all three counts following a six-day trial. He was sentenced to concurrent terms of 84 months of imprisonment and four years of supervised release.

## II.

In reviewing the denial of a motion to suppress, we examine a district court's factual findings for clear error and

its legal conclusions de novo.  United States v. Soto-Peguero, 978 F.3d 13, 20 (1st Cir. 2020).  In this case, however, the facts are essentially undisputed, so we focus on the legal significance of those facts in reviewing the decision of the district court.  In doing so, we construe the record in the light most favorable to the district court's ruling and "will affirm the court's denial of a suppression motion 'as long as that denial is supported by any particularized and objectively reasonable view of the evidence.'" United States v. Adams, 971 F.3d 22, 31 (1st Cir. 2020) (quoting United States v. Tanguay, 811 F.3d 78, 81 (1st Cir 2016)).

## A. Classifying the Vehicle Containment under the Fourth Amendment

Agent Connolly's direct application of force to the Sienna during the vehicle containment, which eventually caused the vehicle to stop, constituted a seizure of Gonzalez's person.  See Brower v. County of Inyo, 489 U.S. 593, 597 (1989) ("If . . . the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure."); see also United States v. Woodrum, 202 F.3d 1, 5 (1st Cir. 2000) (stating that "[i]t is doctrinal bedrock that a police stop of a moving vehicle constitutes a seizure of the vehicle's occupants").  Hence, Gonzalez was seized when the front bumper of Agent Connolly's vehicle met the front bumper of the Sienna driven by Gonzalez and

caused it to stop.  The parties agree on that much.  They disagree, however, on how we should classify that seizure.

Not all seizures of a person amount to an arrest as contemplated by the Fourth Amendment.  See Terry v. Ohio, 392 U.S. 1, 26-27 (1968).  Encounters between the police and citizens that are "sufficiently limited in their intrusiveness . . . fall outside the traditional understanding of an 'arrest,'" United States v. Acosta-Colon, 157 F.3d 9, 14 (1st Cir. 1998), but still within the Fourth Amendment's protective ambit, United States v. Tiru-Plaza, 766 F.3d 111, 115 (1st Cir. 2014).  Such temporary detentions, "by virtue of their low level of intrusiveness relative to the important law enforcement purposes they serve[]," id. (citing Terry, 392 U.S. at 27), can be constitutionally justified by mere "reasonable suspicion that criminal activity [is] afoot," United States v. Rasberry, 882 F.3d 241, 246 (1st Cir. 2018) (quoting United States v. Pontoo, 666 F.3d 20, 27 (1st Cir. 2011)).  If an officer's actions during the encounter become "too intrusive," the temporary detention may "morph into a de facto arrest," which must be supported by probable cause.  Id. at 247.

This case involves a seizure that is "distinguishable from, yet has some features normally associated with, an arrest." Acosta-Colon, 157 F.3d at 15.  On the one hand, at the time of the vehicle containment, Gonzalez was not handcuffed, was not subdued, and was in a public place -- factors suggesting that Gonzalez was

not under arrest.  See United States v. Lee, 317 F.3d 26, 31 (1st Cir. 2003).  On the other hand, nine or ten law enforcement vehicles were present, emergency lights were activated, weapons were drawn, and Agent Connolly used physical force to stop Gonzalez in his vehicle -- factors suggesting that Gonzalez was arrested at the time of the vehicle containment.  See United States v. Taylor, 162 F.3d 12, 21-22 (1st Cir. 1998).

The line between a temporary detention and de facto arrest is elusive and not easily defined.  See, e.g., United States v. Sharpe, 470 U.S. 675, 685 (1985).  However, we need not classify the vehicle containment in this case.  We will assume arguendo that the vehicle containment resulted in Gonzalez's de facto arrest -- the approach more favorable to Gonzalez -- and assess whether Gonzalez's arrest was supported by probable cause.[13]

---

[13] We have taken a similar approach in other cases.  See United States v. Dapolito, 713 F.3d 141, 153 n.12 (1st Cir. 2013) ("On these facts, the question also arises as to whether, at that time, this was a de facto arrest. It is a question the district court did not address, nor do we.  We do note that, if it was an arrest, we think it clear that there was no probable cause for an arrest, there not being even reasonable suspicion."); United States v. Mann, No. 99-1965, 2000 WL 739722, *2 (1st Cir. June 2, 2000) (unpublished table decision) ("Mann contends that when the police surrounded his car and approached him, he was under de facto arrest . . . . [and] that the police did not have the requisite probable cause . . . . [W]e will assume arguendo that Mann was under arrest and determine whether the police had the requisite probable cause to make such an arrest.").

- 15 -

## B. Probable Cause to Arrest Gonzalez

Probable cause "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014). Probable cause to arrest an individual "will be found if 'the facts and circumstances within [the officer's] knowledge and of which [the officer] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense.'" Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 349 (1st Cir. 1995) (quoting Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992)). Probable cause "demands only 'the kind of "fair probability" on which "reasonable and prudent [people,] not legal technicians, act."'" Adams, 971 F.3d at 32 (quoting Florida v. Harris, 568 U.S. 237, 244 (2013)) (alteration in original). It "may be premised on either direct or circumstantial evidence or some combination of the two," and may rely on the "connecting of a series of dots in a commonsense way" with "ample room for reasonable inferences based on common experience." Id. "Direct evidence is not necessary to ground a probable cause determination where . . . the import of circumstantial evidence is obvious." Id. at 33.

At the time of the vehicle containment, the officers, through GPS tracking, physical surveillance, and intercepted communications, developed substantial circumstantial evidence that Gonzalez was in the midst of a drug transaction with Mejia.

- 16 -

Officers knew that Mejia purchased the Sebring with cash, registered it in his girlfriend's name and, based on intercepted communications, arranged for the installation of a hide in the vehicle. They knew Mejia was involved in assisting his brother, Clasico, in the transport of drugs from Mexico to Massachusetts. Through a series of intercepted phone calls over the course of several days, officers heard Mejia discuss with UM-9271 the details of an upcoming shipment of drugs to New York City. In those phone calls, officers heard UM-9271 ask Mejia to give him "the most product" he could. Officers also listened to UM-9271 relay messages to Mejia from Clasico, demonstrating that UM-9271 was in direct communication with the Mexican supplier.

On the evening of November 25th into the early morning hours of November 26th, GPS tracking revealed that Mejia traveled to New York in his Sebring, as agents suspected he would, to retrieve the shipment that he had previously discussed with UM-9271. He returned to the location that officers suspected was a stash house (32 Shaw Street) and parked the Sebring in the garage. Upon his arrival at 32 Shaw Street, officers intercepted a phone call in which Mejia told Clasico that "[e]verything is here now," and confirmed that he had "grabbed 14 and . . . count[ed] them well."

Later that day, Mejia notified UM-9271 that the shipment had arrived, as he promised he would, and the pair devised a plan

to meet in a manner that they hoped would avoid detection by law enforcement. Officers later observed Mejia and UM-9271 meet at Legacy Place, consistent with their plans to do so, and, after a short period of time, leave together in the Sienna. That evening, officers observed the same two individuals -- Mejia and UM-9271 -- arrive at 32 Shaw Street in the Sienna. Officers observed the pair enter the residence and, approximately thirty minutes later, exit the residence and get back into the Sienna. Moments later, the officers executed the vehicle containment and Mejia and UM-9271 were taken into custody.

Based on the evidence possessed by law enforcement at the time they executed the vehicle containment, a "reasonable and prudent" person would have concluded that there was a "fair probability," id. at 32, that (1) Mejia used the hide in the Sebring to retrieve and transport a narcotics shipment from New York to Massachusetts on the evening of November 25, 2013; (2) Mejia stored those narcotics at 32 Shaw Street; (3) over the course of several intercepted phone calls, UM-9271 arranged to purchase, or take possession of with intent to sell himself, a portion of the drug shipment that Mejia was storing at 32 Shaw Street; (4) UM-9271 and Mejia devised a plan to meet at Legacy Place and take one car back to 32 Shaw Street where they would engage in the drug transaction; (5) UM-9271 and Mejia executed that plan, engaging in countersurveillance along the way;

(6) UM-9271 secured drugs from Mejia while inside 32 Shaw Street on the evening of November 26th; and (7) UM-9271 was the same individual who met Mejia at Legacy Place, drove with him in the Sienna to 32 Shaw Street, and was driving the Sienna when it later left the residence and was stopped by officers. The totality of the described circumstances leaves no doubt that the officers "had reasonably trustworthy information" sufficient for a prudent person to believe, see Alexis, 67 F.3d at 349, that the driver of the Sienna -- Gonzalez -- was UM-9271 and that he and Mejia had either just completed or were still in the midst of a drug transaction when officers conducted the vehicle containment. Hence, assuming the vehicle containment resulted in Gonzalez's de facto arrest, it was amply supported by probable cause.

## C. Other Issues

Gonzalez's claim of constitutional error in this case is limited to the officers' conduct in executing the vehicle containment. He argues that the containment was an unlawful arrest and, therefore, the ensuing events -- his subsequent attempt to flee, his eventual detention, and the resulting protective sweep of the Sienna that resulted in the discovery of cocaine and heroin in plain view -- were fruits of the poisonous tree. Because we conclude that the officers had probable cause to arrest Gonzalez when they conducted the vehicle containment -- again assuming that the vehicle containment resulted in Gonzalez's de facto

arrest -- we necessarily reject Gonzalez's fruit of the poisonous

tree arguments.

Affirmed.