# United States Court of Appeals
## For the First Circuit

No. 21-1758

UNITED STATES OF AMERICA,

Appellee,

v.

DAMON FAGAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Kayatta, Howard, and Thompson,
Circuit Judges.

Noreen McCarthy for appellant.
Benjamin M. Block, Assistant United States Attorney, with whom Darcie N. McElwee, United States Attorney, was on brief, for appellee.
Zachary L. Heiden, Carol J. Garvan, Gilles R. Bissonnette, Matthew Warner, and Preti Flaherty LLP, on brief for amici curiae American Civil Liberties Union of Maine Foundation, American Civil Liberties Union of New Hampshire Foundation, and American Civil Liberties Union of Massachusetts, Inc.

June 15, 2023

**KAYATTA**, <u>Circuit Judge</u>.  A traffic stop on the Maine Turnpike for unsafe operation of a vehicle led to the discovery of evidence showing that Damon Fagan was carrying heroin with the intent to distribute it.  Seeking to suppress that evidence, Fagan argued in the district court that the officer who pulled him over lacked a sufficient basis for suspecting that Fagan had committed a motor vehicle violation, and that his detention and interrogation following the traffic stop otherwise violated his constitutional rights.  After the district court denied his motion to suppress, Fagan pled guilty while reserving his right to appeal the refusal to suppress the evidence found in the traffic stop.  For the following reasons, we affirm the denial of Fagan's motion to suppress.

**I.**

On January 6, 2019, shortly before 11:00 p.m., Fagan and a passenger were driving north on the Maine Turnpike, followed by Maine State Trooper John Darcy.  The record supports an inference, and the district court assumed, that the reason Darcy chose to follow Fagan was because Fagan, a Black man, fit Darcy's profile of what he calls "thugs" whom he suspects of drug dealing.  After running Fagan's tag numbers and learning that the vehicle was a registered rental car from a location in Presque Isle (much further north in Maine than where Darcy and Fagan were driving at that time), Darcy continued to follow Fagan.  A few minutes later, while

- 2 -

Fagan was traveling in the right lane, Darcy saw Fagan enter the middle lane to pass a tractor-trailer and then move back into the right lane in front of the tractor-trailer. Darcy then pulled Fagan over. This stop resulted in over an hour and a half of questioning, and concluded with Fagan relinquishing 37 grams of heroin that he was carrying on his person. When later charged with possession with intent to distribute, Fagan moved to suppress the evidence garnered from the traffic stop, arguing that the stop was illegal and that his Fourth and Fifth Amendment rights were violated by the subsequent police questioning.

The contest at the suppression hearing initially focused on whether Darcy had a sufficient basis to pull Fagan over. Fagan did not testify, so all the evidence came from Darcy, a video taken by a dashcam in the police cruiser, and Darcy's body camera that activated after the cars stopped.

The district court found Darcy's testimony to be credible. That testimony was as follows:

Fagan's car was between a tractor-trailer and Darcy's car in the right lane as Fagan's vehicle closed on the tractor-trailer. Fagan's car then moved left into the adjoining lane to accelerate past the tractor-trailer. "[J]ust as" Fagan's car passed the tractor-trailer, Fagan's car "cut off" the tractor-trailer by moving back into the right lane without signaling before crossing the lane line "very close to the front of the tractor-

- 3 -

trailer, not leaving much space for any reaction time," and not leaving "a safe distance in between as it cut in front of the vehicle."  Darcy further described the lane change by noting that Fagan had "turned into that lane close enough in front of that tractor trailer that if [he] had to stop short[] [he] would have caused a collision, most likely."  Darcy "acknowledge[d]" that "the truck never put its brake lights on" and "never swerved."  He also stated he did not know "[w]hether the [trucker] had to downshift to avoid [Fagan]."

The video, taken from a less advantageous angle on the passenger side of Darcy's vehicle, prompted the district court to agree that the move back to the right lane was "abrupt."  Having viewed the video,[1] we do not find this characterization clearly erroneous.  The video also confirms Darcy's testimony that Fagan commenced the lane change without first signaling.  On the other hand, it does not make clear the distance between Fagan's vehicle and the tractor-trailer at the time of the lane change.  The video does not show the front of the tractor-trailer, which Darcy acknowledged in his testimony.  And it also confirms that the tractor-trailer did not brake.  Ultimately, the district court determined that the video was not conclusive either way on the

---

[1]  The video is accessible at https://www.ca1.uscourts.gov/citationsmedia.

safety of the lane change, and we do not find this to be clearly erroneous either.

Darcy himself was not able to put a specific number on the distance between Fagan's car and the tractor-trailer at the time of the lane change other than to say that the vehicles were separated by "very little distance" and the change occurred "just as" Fagan's car passed the tractor-trailer. Nor was he able to estimate Fagan's precise speed when Fagan passed the tractor-trailer. Darcy did agree that the video shows that approximately one second after the pass was completed, Fagan was "three or four car lengths" in front of the tractor-trailer. Fagan agrees that the lane change took roughly four to five seconds from when Fagan began to move right until he completed the change (approximately the same amount of time as Fagan's initial lane change into the middle lane).

After the two cars pulled over, Darcy approached Fagan's vehicle. At the time, Darcy believed -- incorrectly -- that changing lanes without first signaling was in and of itself a violation of Maine's traffic laws. He accused Fagan of both not signaling and cutting off the tractor-trailer. ("You just cut that truck off. You didn't put on your turn signal until you were already in the lane.") When Fagan was unable to produce a license, Darcy had Fagan exit the vehicle and then patted him down, finding a knife. In response to questioning by Darcy, Fagan stated that

he was on bail and his driver's license was suspended.  He said that he and his passenger were coming from shopping in Kittery, Maine.  Separately questioned, the passenger said they were coming from Connecticut where they dropped off a niece and Fagan visited a friend.

Darcy next learned via a computer check that Fagan's license was indeed suspended, that he had prior drug trafficking involvement, and that he was on bail.  Darcy also learned that Fagan's bail conditions imposed a 7:00 p.m. curfew, prohibited Fagan from leaving Maine, and subjected him to searches of his person "at any time without articulable suspicion or probable cause."  Subsequent questioning led to the production of 37 grams of heroin, which Fagan retrieved from between his buttocks after dog sniffs of both the vehicle and its passengers, multiple rounds of questioning, and a body search by Darcy.

Surveying the foregoing, the district court concluded that "a reasonable officer" in Darcy's position "could believe that there was probable cause for this traffic stop."  The court therefore held that the stop did not violate the Fourth Amendment. The district court also rejected Fagan's argument that the discovery of the heroin was the product of improper detention and questioning.

Over a year after the district court denied Fagan's suppression motion, Fagan's lawyers discovered new evidence that

- 6 -

had not been available at the time of the initial hearing. The new evidence included a taped conversation between Darcy and another officer recorded after Fagan's arrest, at the time of an arrest of another person made by Darcy, as follows:

> Darcy: Like if I see a white thug, I'm going to be interested, just like a Black thug, or a fuckin' Chinese thug. Like, I'm interested in thugs. We don't, that's not racial profiling. Like, some Black guy goes by, and he's just some normal dude from Portland, I don't give a fuck, you know what I mean? Like whatever. This guy kind of looks like a thug, to be honest with you.
>
> Other Trooper: You see the guy driving?
>
> Darcy: Yeah. He's wearing a wife-beater, he's got dreads, he looks like a thug, he may not be. And I'm not profiling him racially, because I don't care that he's white, Black. White kid, neck tats all over him, fucking sideways hat, thug, you know what I mean? So like I get . . . I hate when people try to make it seem like that's what it is. I care about where people are from, and the way they seem, do you know what I mean? Like, do they seem like they could be involved in the drug game, or gangs, or something, you know what I mean? I don't give a fuck if somebody's Black, white, like . . . And I like saying this, Nicole has a fucking niece who is half Black, I'll tell someone like, my niece is half-Black, don't play that racial shit with me.

The district court noted, and the government agrees on appeal, that using racial profiling to selectively enforce the law violates the Fourteenth Amendment to the United States Constitution. Both parties also agreed below -- and agree on appeal -- that the existence of a racially discriminatory

motivation for a stop and search provides no basis for suppressing evidence gathered in the search if there was otherwise sufficient cause for the stop and search. See Whren v. United States, 517 U.S. 806, 813 (1996).

The district court nevertheless recognized the possibility that evidence of an officer's racial bias could undercut the officer's credibility in reporting on the actions taken by the target of his selective hunt. So it agreed to a limited reopening of the suppression hearing to receive the new evidence and to consider anew whether Darcy's description of Fagan's driving was credible. The court concluded that Darcy's description remained credible. In short, even though it assumed Darcy had been motivated to follow Fagan and to find a reason to stop him because Darcy believed that persons fitting Fagan's profile were "thugs," the court reaffirmed its finding that Darcy's description of Fagan's driving was credible. And the court further reaffirmed that that even though it "[could not] determine actual separation distance between the two vehicles," it did "not find that Darcy lied in giving the unsafe lane change explanation" and once again denied the motion to suppress.

Fagan subsequently entered a conditional plea of guilty on August 18, 2021, and was sentenced to twenty-one months' imprisonment and an additional three years of supervised release.

The terms of his plea agreement reserved his right to appeal the decision not to suppress the heroin found on him.

## II.

## A.

We consider first the stop of the car driven by Fagan, starting with the applicable law. When Darcy pulled Fagan over, he effected a "seizure" of Fagan within the meaning of the Fourth Amendment. Brendlin v. California, 551 U.S. 249, 255-59 (2007). Both parties agree that to justify such a seizure for a traffic violation the officer must have a "reasonable suspicion" that the person stopped is breaking the law. Heien v. North Carolina, 574 U.S. 54, 60 (2014). A mere hunch is not enough; on the other hand, the level of proof required is "'obviously less' than is necessary for probable cause." Navarette v. California, 572 U.S. 393, 397 (2014) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)); see also United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004) ("[T]he showing required to meet this standard is considerably less demanding than that required to make out probable cause.").

In gauging whether the circumstances generate a reasonable suspicion, we apply "an objective standard, rather than assessing the subjective intent of an individual officer." United States v. Tiru-Plaza, 766 F.3d 111, 116 (1st Cir. 2014). We are restricted to asking whether a hypothetical reasonable officer

- 9 -

considering what Darcy observed[2] would reasonably suspect that Fagan had operated his vehicle unsafely in violation of Maine's traffic laws. See id.

In this case, the relevant traffic laws are those prohibiting unsafe lane changes. See Me. Rev. Stat. Ann. tit. 29-A, § 2070.1 ("Passing on left. An operator of a vehicle passing another vehicle proceeding in the same direction must pass to the left at a safe distance and may not return to the right until safely clear of the passed vehicle."); § 2071.1 ("Prohibition. An operator may not turn a vehicle or move right or left on a public way unless the movement can be made with reasonable safety."). In Maine, failing to signal before changing lanes is not per se an infraction. See Pooler v. Clifford, 639 A.2d 1061, 1062 (Me. 1994). Whether and when a signal is made can bear, however, on whether the lane change is safe. See id.

**B.**

Given the foregoing controlling law, Fagan's Fourth Amendment challenge to his conviction turns on whether the district court committed reversible error in finding that the circumstances gave rise to a reasonable suspicion that Fagan changed lanes in an unsafe manner. In addressing that question, we employ a bifurcated

---

[2] The government makes no claim that any other officer knew or observed anything that should be included in our analysis of the initial stop.

- 10 -

standard of review.  First, as to any issues of fact (here, what happened), we must accept the district court's factual findings absent clear error.  Tiru-Plaza, 766 F.3d at 114-15.  In so doing, we need not accept illogical findings, Mitchell v. United States, 141 F.3d 8, 17 (1st Cir. 1998), or mere guesswork, McGuire v. Reilly, 260 F.3d 36, 45-46 (1st Cir. 2001).  But we must consider the facts in the light most favorable to the district court's ruling, United States v. Fermin, 771 F.3d 71, 76 (1st Cir. 2014). Importantly for purposes of this appeal, our review must be "'especially deferential' to the district court's evaluation of witnesses' credibility."  United States v. Sierra-Ayala, 39 F.4th 1, 13 (1st Cir. 2022) (quoting United States v. Jones, 187 F.3d 210, 214 (1st Cir. 1999)).  Thus, "absent objective evidence that contradicts a witness's story or a situation where the story itself is so internally inconsistent or implausible that no reasonable factfinder would credit it, 'the ball game is virtually over' once a district court determines that a key witness is credible."  Id. (quoting United States v. Guzmán-Batista, 783 F.3d 930, 937 (1st Cir. 2015)).

Second, as to issues of law (most notably, whether the facts viewed in the light most favorable to the district court's decision gave rise to a reasonable suspicion of a traffic violation), we proceed afresh, albeit in drawing these legal conclusions we must "give appropriate weight to the inferences

- 11 -

drawn by the district court and on-scene officers, recognizing that they possess the advantage of immediacy and familiarity with the witnesses and events." Tiru-Plaza, 766 F.3d at 115; see Ornelas v. United States, 517 U.S. 690, 699 (1996) (we must "give due weight from inferences drawn from [the] facts by resident judges and local law enforcement officers.") Our charge is to ask what a hypothetical reasonable officer would have thought of the situation, not to accept automatically Darcy's ultimate conclusion that Fagan drove unsafely. But once the district court accepts an officer's testimony as credible -- which the district court did here -- absent evidence to the contrary, we must treat the officer's report of what he saw as evidence of what the hypothetical reasonable officer would have seen. See, e.g., United States v. Dion, 859 F.3d 114, 127 & n.10 (1st Cir. 2017) (affirming district court's finding that officer was credible, and considering defendant's nervousness, which officer had testified to, in evaluating legality of a stop); United States v. Gilliard, 847 F.2d 21, 24-25 (1st Cir. 1988) (affirming district court's credibility finding and taking officer observations into account to determine that stop was justified).

## C.

We return now to Darcy's description of what he saw.

Darcy testified that without first signaling, Fagan "cut in" to the right lane in front of the tractor-trailer, "leaving

very little distance between the two," such that it would likely have caused a crash had Fagan needed to stop quickly. Darcy also explained that there was "not . . . a lot of traffic, [and] there was no need for the vehicle to cut over immediately." Fagan points out that Darcy could not state the actual distance in feet or yards between the rear of Fagan's car and the front of the tractor-trailer. But it did appear to Darcy -- then a state trooper whose job entailed surveilling turnpike traffic -- to be "very close." See Tiru-Plaza, 766 F.3d at 116 (granting "respect to the ability of trained and experienced police officers to draw from the attendant circumstances inferences that would 'elude an untrained person.'" (quoting United States v. Cortez, 449 U.S. 411, 418 (1981))). Darcy also agreed that Fagan's car was approximately "three or four car lengths" in front of the tractor-trailer "roughly one second" after Fagan completed the lane change. Fagan, in turn, was moving faster than the tractor-trailer shortly after he completed his pass (as evidenced by the video, which shows Fagan moving away and quickly leaving enough space for Darcy's cruiser to pass in front of the tractor-trailer). And as Fagan's brief on appeal states, the lane change from start to finish took roughly four to five seconds. Taking all these facts together, and viewing them (as we must) in the light most favorable to the conclusion reached by the district court, see Fermin, 771 F.3d at 76, we agree with the district court that a reasonable officer could have

suspected that Fagan executed an unsafe lane change. In particular, a reasonable officer could have suspected that Fagan was quite a bit closer than three to four car lengths when he began moving abruptly into the tractor-trailer's lane without first signaling.

Simple math shows why such a qualitative suspicion generated by these facts is reasonable. Start with the fact that Fagan's car was three to four car lengths in front of the truck about one second after Fagan had completed the pass. As the dissent fairly estimates, that is 45–60 feet, which we will assume is a safe distance.[3] Key then is how much closer the two vehicles were roughly five to six seconds earlier when the lane change commenced (since, as Fagan's brief states, the change itself took four to five seconds). The answer depends on how much faster Fagan was traveling than was the tractor-trailer. As Fagan and the dissent note, the record does not contain direct evidence of either driver's speed. But the video visibly shows Fagan driving faster as he passed the tractor-trailer (how else to pass it). The video also shows that when Darcy got to the front of the tractor-trailer,

---

[3] This assumption is generous to Fagan given that the National Highway Traffic Safety Administration warns that it takes 1.5 seconds to react and hit the brakes and a typical vehicle going 55 miles per hour travels 121 feet in 1.5 seconds. See U.S. Dep't of Transp. Nat'l Highway Traffic Safety Admin., Safety 1n Num3ers (August 2015), https://one.nhtsa.gov/nhtsa/Safety1nNum3ers/august2015/S1N_Aug15_Speeding_1.html (last visited June 9, 2023).

Fagan was by then well more than three to four car lengths away (i.e., he was going quite a bit faster than the truck), and Darcy agreed at the suppression hearing that Fagan's car was "moving further away from the tractor trailer" after the pass.  That is to say, having been moving visibly faster than the tractor-trailer in order to pass it, Fagan's car gave no indication that it did not maintain that greater speed throughout the lane change.  Conservatively assuming just a five mile per hour speed differential, and conservatively assuming that the elapsed time was five seconds, not six, the math is as follows:

$$\frac{5\ miles}{hour} \times \frac{5280\ feet}{mile} \times \frac{hour}{3600\ seconds} \times 5\ seconds = 36.67\ feet\ closer$$

In short, given the facts drawn from Darcy's testimony, along with the video footage, one could estimate that at the time Fagan began to abruptly move back into the slow lane without first signaling, the distance between the vehicles may have been very tight; i.e., it could have been as little as between 9 and 24 feet (45 to 60 feet minus 36 feet).  The dissent does not dispute that the methodology represented by this equation properly converts Fagan's position when Darcy got to the front of the tractor-trailer to Fagan's position when he commenced the lane change.  Instead, the dissent challenges only the values assigned to two variables -- the speed differential between Fagan's vehicle and the tractor-

trailer, and the amount of time that it took to complete the lane change.

As to the latter, the dissent contends that we should use one second rather than five. But one second was the time between the completion of the lane change and the time at which Fagan was viewed three to four car lengths in front. The relevant time is the four to five seconds that Fagan admits passed from the beginning to end of his move into the slow lane in front of the truck, plus the additional second that elapsed before Fagan was three to four car lengths away from the truck.

That leaves only the speed differential. If the dissent were correct that there was no difference in speeds during and following the pass, then the pass must have begun with a three to four vehicle gap. So, too, though, if the speed differential were anything like five miles per hour, then the belatedly signaled lane change began with only a 9 to 24 foot gap. And even the dissent does not argue that Darcy could not reasonably suspect such a lane change to be unsafe.

The video bears twice on the issue of the speed differential. First, although it does not reveal the vehicles' precise speeds, it shows that Fagan's car was clearly going visibly faster than the tractor-trailer just before it began the lane change. Second, it provides no support for the counter-intuitive

- 16 -

possibility that Fagan did not maintain or even increase that greater speed throughout the lane change.

Our dissenting colleague posits that maybe the tractor-trailer sped up when its driver saw Fagan in its lane. But if that had happened, Fagan would still have been three to four car lengths ahead when Darcy got beside the tractor-trailer. And the video plainly shows that Fagan by that point was even further in front of the tractor-trailer; i.e., he was still going faster than the tractor-trailer.

None of this is to suggest that Darcy did the math. Rather, it is to show that the facts in the record -- such as they are -- reasonably accommodate his qualitative assessment as an experienced state trooper of the abrupt lane change as being "too close." And given all of this, we cannot say that the district court erred in concluding that a reasonable officer in Darcy's position could have reasonably suspected he had witnessed unsafe driving.

Nor is this conclusion belied by Darcy's agreement that the stop lights on the tractor-trailer did not flash, nor did that vehicle otherwise appear to alter course. That strongly suggests that the driver of the tractor-trailer felt no danger. But the absence of a discernable reaction by the tractor-trailer driver does not necessarily mean that a person in Darcy's position could not reasonably assess the safety of Fagan's move differently. The

"reasonable suspicion" required to justify a traffic stop does not require certainty or even correctness, and reasonable people can disagree on what is objectively safe. See United States v. Arvizu, 534 U.S. 266, 277 (2002). That Darcy and the driver of the tractor-trailer may have disagreed as to whether Fagan cut off the tractor-trailer does not necessarily mean that either Darcy or the driver of the tractor-trailer was unreasonable.

**D.**

Recognizing the importance of Darcy's credibility in the foregoing analysis, Fagan and his supporting amici train their focus on Darcy's state of mind. In so doing, Fagan stresses that he is "not arguing for suppression because of Darcy's reprehensible racial profiling." Rather, Fagan makes the more subtle argument that Darcy's bias and his eagerness for a drug bust should have precluded the district court from giving credence to Darcy's version of what transpired. And were Darcy's testimony discounted, there would remain no sufficient basis from which one could generate reasonable suspicion of a traffic violation.

We agree with Fagan's contention that evidence of an officer's racial bias in deciding which drivers to surveil and stop can undercut the credibility of the officer's description of the facts that supposedly justified the stop. The district court did not reject this contention. To the contrary, it reopened the suppression hearing precisely to accept the new evidence tendered

- 18 -

by Fagan and to consider again Darcy's credibility. In the district court's words, "[t]he question before [the court] on the reopened motion [was] whether Darcy lied in saying that Fagan executed an unsafe return to the right-hand lane." In turn, the district court made clear that in answering that question, the court considered all of the new evidence, and assumed that Darcy "singled out Fagan's vehicle for improper reasons as it went through the York toll plaza." The district court also made clear its plainly correct view that "racial profiling is reprehensible."

Unfortunately for Fagan, after hearing all the new evidence and extended questioning of Darcy, the district court found that "irrespective of Darcy's personal motivation, I do not find that Darcy lied in giving the unsafe lane change explanation." In explaining this conclusion, the district court focused on two facts upon which the parties agreed: (1) at the time of the arrest, Darcy wrongly thought that failing to signal before initiating a lane change was per se a violation of the motor vehicle laws; and (2) the video confirmed that Fagan initiated his lane change in front of the tractor-trailer without first signaling. Therefore, reasoned the district court, Darcy had no reason to fabricate his

contemporaneous description recorded on his dashcam of the closeness of the lane change in order to justify the stop.[4]

So Fagan is left to argue that we should reject as clear error the district court's express finding that Darcy was credible. Fagan points out that after his motion was denied, another judge found Darcy not to be "a very credible witness."  But of course the judge in this earlier case could not have known that.  And the fact that a witness's credibility is found lacking in one case does not mean that his testimony must be retroactively deemed not credible as a matter of law in other cases.  Nor does it constitute the kind of "objective evidence that contradicts [Darcy's] story" to which he testified in this particular case that we would need to overturn a credibility finding on appeal.  Guzmán-Batista, 783 F.3d at 937-38 (determining that where defendant presented "compelling evidence" of his version of events, but that evidence "create[d] two possible alternative version of the events," the district court's choice between those alternatives could not be deemed clearly erroneous).

Finally, the dissent implicitly assails Darcy's credibility by questioning Darcy's characterization of the lane change as cutting off the tractor-trailer at so close a distance

---

[4] Darcy stated when he first spoke to Fagan after pulling him over:  "You just cut that truck off.  You didn't put on your turn signal until you were already in the lane."

as to create an "almost-crash situation." The dissent then suggests that Darcy's characterization exaggerates how close the vehicles came, and thus undercuts Darcy's testimony. But the district court -- which viewed the video and observed Darcy testify -- found Darcy credible on the issue of whether he had seen Fagan make an unsafe lane change. Ultimately, not even the dissent can argue that we are not effectively bound by the district court's opinion that Darcy was credible.

*   *   *

To summarize, three rules of law that we must apply drive our holding: (1) a stop for a mere traffic violation, even when supported only by a reasonable suspicion that such a violation occurred, does not violate the Fourth Amendment, Heien, 574 U.S. at 60; (2) racial profiling, while a violation of the Fourteenth Amendment, does not trigger the exclusionary rule as it might were it a Fourth Amendment violation, Whren, 517 U.S. at 813, 819; and (3) district courts must be given broad leeway in determining the credibility of witnesses who testify before them, Sierra-Ayala, 39 F.4th at 13. Given these rules, we must affirm the district court's holding that Darcy did not violate the Fourth Amendment in pulling over Fagan's vehicle for a traffic violation.

## III.

We turn next to Fagan's alternative Fourth and Fifth Amendment arguments for barring the government from using as

- 21 -

evidence the heroin recovered during the stop.  Fagan challenges the length of his detention at the roadside and the continued questioning and searches that led eventually to his retrieval of the drugs from between his buttocks.  He claims that his prolonged detention and the aggressive and repeated questioning (both before and after <u>Miranda</u> warnings were given) violated his Fourth Amendment right to be free of unreasonable seizures and Fifth Amendment right not to be coerced into making statements, respectively.

We need not decide whether officers detained Fagan too long or coerced the production of the drugs.  Rather, the controlling law is clear that evidence found unlawfully is not excluded if it would have inevitably been discovered anyhow through lawful means.  <u>United States</u> v. <u>Almeida</u>, 434 F.3d 25, 28 (1st Cir. 2006).  We ask three questions when evaluating an inevitable discovery argument:  "[F]irst, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections."  <u>Id.</u>  An arrest is "truly independent" of an interrogation if "(1) the police, in fact, would have arrested the defendant, even without first having discovered the challenged

evidence, and (2) in the absence of the challenged evidence, the officers nevertheless had probable cause to make the arrest without the challenged evidence."  Id.  The government has the burden to show the exception applies.

The district court made findings that directly support its conclusion that discovery of the drugs was inevitable.  First, the officers had ample grounds -- lawfully obtained during "ordinary inquiries incident to [the traffic] stop" -- to arrest Fagan.  Rodriguez v. United States, 575 U.S. 348, 355 (2015) (quoting Illinois v. Caballes, 543 U.S. 405, 408 (2005)).  In brief, after stopping Fagan and asking for his driver's license, and procuring a quick criminal history search,[5] Darcy learned that Fagan had prior involvement with illegal drugs, that he was out on bail, that he was violating the conditions of his release on bail by being out after 7 p.m. and by likely having left Maine, and that as a condition of his release he had agreed to be subject to search without cause.  Second, the officers would have indeed arrested Fagan -- as Darcy told him -- had he not produced any drugs, and the standard search at the jail would have discovered the drugs.  Third, since the officers knew that they could lawfully arrest Fagan, and that he had consented to searches as a condition of bail, the potential for incentivizing unlawful detentions in

_____

[5]  See Rodriguez, 575 U.S. at 355 (checking for outstanding warrants is an ordinary inquiry pursuant to a traffic stop).

other cases was mitigated. Based on the foregoing, the district court concluded that, once Darcy learned that Fagan had been involved with illegal drugs, was driving with a suspended license, and was violating his bail conditions, the discovery of the drugs would have been inevitable even had the officers conducted no further search or questioning at the scene. In so concluding, the court committed no clear error.

**IV.**

Finally, we turn to Fagan's argument that the district court erred in denying his motion for discovery regarding other stops Darcy had made. Fagan argues that he could have impeached Darcy's credibility by showing that he stopped minority drivers at a statistically higher rate if the district court had allowed this discovery.

On its face, the proposed discovery seems aimed at proving something that the district court already presumed to be true: that Darcy's singling out of Fagan was racially motivated. In any event, we agree with the government that this challenge is waived, because Fagan pled guilty and did not identify this discovery order as one he reserved the right to appeal. The conditional plea agreement only identifies the rulings on the motion to suppress as appealable, with no reference to the ruling on Fagan's discovery motion. A separate hearing was held and a separate order issued on Fagan's discovery motion, and this order

was not identified in the conditional plea.  Any challenge to an order not specified in the conditional guilty plea is waived by the plea.  Federal Rule of Criminal Procedure 11(a)(2) allows a defendant to enter a conditional guilty plea, "reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion" (emphasis added).  See United States v. Ramos, 961 F.2d 1003, 1005-06 (1st Cir. 1992), overruled on other grounds by United States v. Caron, 77 F.3d 1 (1st Cir. 1996).  Because Fagan's motion was not specified, his challenge is waived.

## V.

For the foregoing reasons, the judgment of the district court is affirmed.

**- Dissenting Opinion Follows -**

**THOMPSON**, <u>Circuit Judge</u>, **dissenting.** The majority concludes that objective facts and rational inferences point to a reasonable suspicion that Fagan made an unsafe lane change — something the government had the burden of proving. <u>See, e.g.,</u> <u>United States</u> v. <u>Monteiro</u>, 447 F.3d 39, 43 (1st Cir. 2006). But I could not disagree more. What follows is my best effort to explain why.

## I

Drug cases often follow a familiar pattern. Police officers stop a car for a traffic offense, even a minor one — driving is so heavily regulated that officers have nearly endless chances to stop anyone they want: experience shows "that no local police force can strictly enforce the traffic laws, or it would [pull over] half the driving population on any given morning." <u>See</u> Robert Jackson, *The Federal Prosecutor*, Address Delivered at the Second Annual Conference of United States Attorneys (Apr. 1, 1940), quoted in <u>Morrison</u> v. <u>Olson</u>, 487 U.S. 654, 727-28 (1988) (Scalia, J., dissenting); <u>see also</u> <u>United States</u> v. <u>Magallon-Lopez</u>, 817 F.3d 671, 676 (9th Cir. 2016) (Berzon, J., concurring) (mentioning <u>Whren</u> v. <u>United States</u>, 517 U.S. 806, 810 (1996)). Citing some exception to the rule against warrantless searches, officers then find drugs in the car or on the driver. Which in turn leads to federal drug charges. And if a judge does not suppress the drugs — because, say, the judge finds the specific

- 26 -

facts known to the officers gave rise to an objectively reasonable suspicion of illegal activity — the driver-turned-defendant enters a conditional guilty plea that reserves the stop issue for appellate review.

Our case — involving Darcy's tailing Fagan's car for miles (after it drove through the toll area without incident) solely because of Fagan's *race* (as no one really disputes) — presents a troubling twist on this general storyline. See generally Atwater v. City of Lago Vista, 532 U.S. 318, 372 (2001) (O'Connor, J., dissenting) (stating that, "as the recent debate over racial profiling demonstrates all too clearly, a relatively minor traffic infraction may often serve as an excuse for stopping and harassing an individual").[6] But put aside Darcy's racist

---

[6] The majority mentions (in a block quote above) how Darcy shared with a trooper colleague his thoughts and feelings about people who (in his view) look like "thugs." The reader may be interested in knowing that Terrel Walker was Darcy's looks-like-a-thug driver. Walker, Darcy said, "was a [B]lack male, approximately late 20s at the time," who was wearing a "wife beater" — *i.e.*, "a thin undershirt tank top." Darcy spotted Walker as he (Walker) rolled through the toll booth on I-95, ran his license plate, followed him, stopped him for "[f]ailing to keep right except for overtaking or passing," and smelled marijuana. A drug-sniffing dog alerted officers to the presence of narcotics. And officers found cocaine and fake Xanax pills. Facing federal drug charges, Walker asked the district court to dismiss the indictment given Darcy's targeting him because of his race (a violation of the Fourteenth Amendment's Equal Protection Clause) or to suppress the evidence given his lack of reasonable suspicion for the stop (a violation of the Fourth Amendment's search-and-seizure clause). See Whren, 517 U.S. at 513, 519 (indicating that a racial-bias issue like this is an equal-protection problem, not a search-and-seizure problem). But the government then moved to

motives. I say that because (as the majority correctly says) Fagan chose to attack the reasonableness of Darcy's suspicion (a search-and-seizure issue), not Darcy's racially-selective conduct (an equal-protection issue). Which (as intimated earlier) means the key question is whether the record facts and their fairly-drawn inferences paint a picture sufficient to raise an officer's reasonable suspicion that Fagan changed lanes unsafely. Again, unlike the majority, I answer that question with a hard no (even assuming for argument's sake that Darcy testified credibly).

## II

Time for some background legal principles, most of which the majority touched on.

### A

#### 1

To justify a car stop, an officer must have at least a reasonable suspicion — *i.e.*, "specific and articulable facts . . . taken together with rational inferences from those facts" — that a traffic offense occurred. See Terry v. Ohio, 392 U.S. 1, 21 (1968); see also United States v. Miles, 18 F.4th 76, 79 (1st Cir. 2021). Judges look at all the circumstances in a commonsense way to see if a particularized and objective basis — viewed from the perspective of an objectively reasonable officer — existed for

---

dismiss the indictment, saying that outcome "would be in the best interests of justice" — a motion the district court granted.

- 28 -

suspecting illegality.  See, e.g., United States v. Arvizu, 534 U.S. 266, 277 (2002); Illinois v. Wardlow, 528 U.S. 119, 125 (2000).  That standard requires something *less* than probable cause — but something *more* than gut feelings or unvoiced hunches.  See, e.g., Wardlow, 528 U.S. at 123-24.  And the government bears the burden of proving it.  See, e.g., Monteiro, 447 F.3d at 43.

### 2

Inference-drawing plays a starring role in the majority's analysis.  So a word or two about it is in order.

An inference is reasonable if it flows from the basic facts in evidence.  See, e.g., Terry, 392 U.S. at 21.  To put the point another way, it "is a reasoned, logical decision to conclude that a disputed fact exists *on the basis of another fact* [that *is known to exist*]."  See Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999) (brackets in original and emphases added) (quoting a leading treatise on federal jury instructions).  So guesswork is *not* a reasonable inference, to give an obvious example.  See, e.g., id.

### B

### 1

We give fresh-eyed *de novo* review to the judge's reasonable-suspicion ruling but clear-error review to his underlying fact-findings, see Miles, 18 F.4th at 78 — all while "assess[ing] the record evidence in the light most favorable" to

the decision, see United States v. Perez, 977 F.3d 163, 168 (1st Cir. 2020).

**2**

Of all the concepts raised in the preceding sentence, clear error needs some attention given the importance the majority and the government place on it.

The first thing to know is that clear error is not a particularly illuminating term. And don't just take my word for it — take Judge Learned Hand's too.[7] "It is," he wrote, "idle to try to define the meaning of th[at] phrase . . .; all that can be profitably said" is that a reviewing court — "though it will hesitate less to reverse" a judge-finding than a jury-finding — "will nevertheless reverse it most reluctantly and only when well persuaded." See United States v. Aluminum Co. of Am., 148 F.2d 416, 433 (2d Cir. 1945).

But while clear error's meaning "is not immediately apparent," we can pick out "certain general principles" from the caselaw. See Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985). Chief among them is that a finding is clearly erroneous if we "definite[ly] and firm[ly]" decide that the judge made a

---

[7] For anyone into rankings, Judge Hand "is considered by many the third-greatest judge in the history of the United States, after [Oliver Wendell] Holmes and John Marshall; some might even rate him higher." Richard A. Posner, *The Learned Hand Biography and the Question of Judicial Greatness*, 104 Yale L.J. 511, 511 (1994) (book review).

"mistake" — even where "there is evidence to support" the finding. See United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948); see also McGuire v. Reilly, 250 F.3d 36, 45-46 (1st Cir. 2001); Irving v. United States, 49 F.3d 830, 836 (1st Cir. 1995). So, for example, a finding is clearly erroneous if the judge accepts a witness's version of events that is illogical or contradicted by other physical evidence. See Mitchell v. United States, 141 F.3d 8, 17 (1st Cir. 1998); Irving, 49 F.3d at 835. Or, to use another example, a finding is also clearly erroneous if the judge "settl[es] for *guesswork*" instead of "reason[ing] from *facts*." See McGuire, 250 F.3d at 46 (emphases added).

On the degree-of-deference scale, clear error is "conventionally regarded" as a less deferential model than abuse of discretion. See Haugh v. Jones & Loughlin Steel Corp., 949 F.2d 914, 916-17 (7th Cir. 1991) (Posner, J., for the court). And while the standard is "formidable, it is not" (to use a different metaphor) "a juggernaut that crushes everything in its path." See Uno v. City of Holyoke, 72 F.3d 973, 978 (1st Cir. 1995); see also Jose Santiago, Inc. v. Smithfield Packaged Meats Corp., 66 F.4th 329, 340-41 (1st Cir. 2023).

A key takeaway then is that clear-error review — though certainly respectful — is not (to use yet another metaphor) a one-way ticket to an affirmance. See, e.g., United States v. Henderson, 463 F.3d 27, 44-45 (1st Cir. 2006) (vacating on clear-

error review a judge-finding made after a suppression hearing); United States v. Forbes, 181 F.3d 1, 7-8 (1st Cir. 1999) (same).

### III

Now time for a recap of Darcy's testimony (given at both hearings) and the judge's reasoning (reflected in both decisions) for denying Fagan's suppression motion.

### A

Tracking Fagan's travels just because (to quote the majority) "Fagan, a Black man, fit Darcy's profile" of a drug-dealing "thug[]," Darcy eventually drove up behind him. Fagan at that point was behind a tractor trailer. And all three (Darcy, Fagan, and the trucker) were in the slow lane.

According to Darcy, Fagan then moved to the middle lane, passed the truck, and switched back to the slow lane.[8] No one disputes that Darcy was still behind the tractor trailer when Fagan made the switch-back and so could not see that maneuver. Unsurprisingly then, Darcy could not specify the distance between Fagan and the trucker when the switch-back occurred. Perhaps eager to fill in that gap, Darcy still said that "very little distance" separated "the two" at that critical moment. Darcy added that Fagan had gotten back in "that lane close enough in front of that tractor trailer that if [he (Fagan)] had to stop short[] [he] would

---

[8] Like the parties and the majority, I use "tractor-trailer," "tractor trailer," and "truck" interchangeably.

- 32 -

have caused a collision, most likely."  And Darcy later said that about "a second" after the switch-back, he could see Fagan's car "maybe three or four car lengths" ahead of the truck.

Looking to score points, the defense got Darcy to admit that he only saw Fagan's "whole vehicle for the first time" once he (Darcy) moved to the center lane.  The defense later asked Darcy whether he based his unsafe-lane-change assessment "on [the] distance between the truck and the vehicle" — to which he answered, "[y]es, . . . it was the manner in which [Fagan] essentially, for lack of a better term, cut off the tractor trailer, changing into [the slow] lane too close to the tractor trailer."  But then when asked by the defense whether he "could[] measure how many feet [Fagan] was in front of the truck," Darcy replied he "could not . . ., that is correct."  Nor could Darcy estimate Fagan's speed when he (Fagan) got in front of the tractor trailer.  And when asked by the defense to "acknowledge in the [dashcam] video that . . . you can never see the actual front of the truck," Darcy came back with "[c]orrect."[9]  Darcy also agreed with the defense that he believed that Fagan "almost crashed into" the tractor trailer, but "acknowledge[d]" that "the truck never put its brakes on" and

---

[9]  Again, the video is accessible at https://www.ca1.uscourts.gov/citationsmedia.

"never swerved."  "Whether the [trucker] had to downshift to avoid [Fagan]" Darcy did not know either.

**B**

Denying the suppression motion, the judge at one point framed the relevant issue as "whether Darcy lied in saying that Fagan executed an unsafe return to the right-hand lane."  That mattered, the judge wrote, because "[i]f Fagan's maneuver was not unsafe, then the hypothetical reasonable police officer had no basis to pull him over."  Paraphrasing the testimony, the judge noted that Darcy said that Fagan

> cut off the tractor trailer, that it was very close to the front of the tractor trailer, not leaving much space for any reaction time, did not leave a safe distance in between as it cut in front of the vehicle, and if it had to stop shortly it would have caused a collision most likely.

And the judge ultimately found Darcy's account "credible," even after "[a]ssuming" he (Darcy) "singled out Fagan's vehicle for improper reasons as it went through the . . . toll plaza."

Convinced that the dashcam video did not "contradict[]" Darcy's testimony, the judge noted that the footage "appear[ed]" to show "that [Fagan's] return to the right lane was abrupt."  The judge also noted that the video never showed the trucker "activating his brakes or taking evasive maneuvers."  But the judge discounted that fact because he had "no idea how alert the [trucker] was or how aggressively he drove."  So the judge did not

consider the video conclusive either way on the safety question. And even though the judge "[could not] determine the actual separation distance between the two vehicles," he held "the traffic stop was lawful."

## IV

Time then for my take on the issue.

## A

From the just-given recap one can see that Darcy tied his unsafe-lane-change theory to Fagan's supposedly *cutting off* the tractor trailer at *so close a distance* as to create an *almost-crash situation* — an account the judge credited in finding reasonable suspicion. The majority and the government offer lots of reasons why they think the judge's reasonable-suspicion conclusion holds together. But none is convincing, at least by my lights.

## B

## 1

Picking up on one of the government's arguments — an argument centered on downplaying how the truck blocked Darcy's view of Fagan's switch-back — the majority points to Darcy's testimony that about a second after Fagan's return to the slow lane, he could see Fagan's car maybe "three or four car lengths" ahead of the truck. Ignore for present purposes that the record

never says what Darcy meant by car length.[10]  And assume for argument's sake that Darcy had in mind 15 feet, which is roughly the length of the *average* car.  See Susan Meyer, *Study: Average Car Size is Increasing — Will Roads Still be Safe for Small Cars and Pedestrians?*, https:www.thezebra.com/resources/driving/average-car-size (last visited June 8, 2023).  So Darcy essentially said that Fagan was about 45 to 60 feet ahead of the truck a second after the pass.[11]  Neither the majority nor the government argues — and the judge never found — that that amount of space is too small for a safe lane change.  Instead the majority (emphasis mine) contends that we should infer that Fagan must have been "quite a bit *closer*" than that to the truck.  The theory goes something like this (the quotes come from the majority):  "[T]he lane change from start to finish took roughly four to five seconds."  "[A]ssuming just a five mile per hour speed differential," and supposing "that the elapsed time was five seconds, not six," the

---

[10] It does not take an automotive engineer to know that cars come in many sizes.  According to one website, a "mini-car" is about 10 feet long, a "mid-sized car" is about 15 feet long, a "full-sized car" is about 16 feet long, a "small SUV" is about 14 feet long, and a "large SUV" is about 17 feet long.  See Gerard Stevens, *Average Car Length: All You Need to Know About It*, Way, https://www.way.com/blog/average-car-length (last visited June 8, 2023).

[11] To give a sense of perspective, a gap of 45 to 60 feet is (roughly) equivalent to a typical 4 to 6 story building laid on its side.  See *How Tall is a Storey in Feet?*, Skydeck, https://theskydeck.com/how-tall-is-a-storey-in-feet (last visited June 8, 2023).  That is no small thing, to state the obvious.

majority "estimate[s] that at the time Fagan began" the "abrupt[]" switch-back, "the distance between the vehicles may have been very tight; i.e., it could have been as little as between 9 and 24 feet." The majority then coats its theory with the veneer of (what it calls) "simple math":

$$\frac{5 \, miles}{hour} \times \frac{5280 \, feet}{mile} \times \frac{hour}{3600 \, seconds} \times 5 \, seconds = 36.67 \, feet \, closer$$

"45 to 60 feet minus 36 feet" gets you to "between 9 and 24 feet," the majority writes. But the majority can get no mileage from that argument.

### (i)

Stepping back, some things are clear.

First, given the distance between Fagan's car and Darcy's cruiser, with an intervening truck and all three vehicles basically going straight, one cannot — simply by watching the dashcam video — reasonably calculate the space between Fagan's auto and the truck's front when Fagan switched to the slow lane. Indeed the judge (recall) admitted that he could not make that determination. But one can see that the trucker did *not* react as a trucker reasonably could be expected to react after an almost-crash-causing cut off. The video shows *no* brake lights, *no* swerve, *no* sign of any engine slowdown, for example.

The majority concedes that that list of *no*s "strongly suggests that the [trucker] felt no danger." But the majority

- 37 -

(emphasis mine) theorizes that perhaps the trucker "*may have disagreed*" with Darcy about "whether Fagan cut off the [truck]" in an unsafe way, then adding too that "reasonable people can disagree on what is objectively safe." Call me unconvinced. Keeping in mind that our review of the evidence must be commonsensical, see Wardlow, 528 U.S. at 125, I think it strains common sense to suggest that a reasonable trucker faced with an almost-crash set-up (which is how Darcy described it) would *not* react in some way. What the majority is doing is relying on a hunch or a guess instead of facts or rational inferences drawn from facts — the "*may have disagreed*" language is a tip off. And (to repeat) reasonable suspicion — while not the toughest of standards — certainly demands more. See id. at 124; see also McGuire, 260 F.3d at 46; United States v. Espinoza, 490 F.3d 41, 48 (1st Cir. 2007).

Echoing the judge's reasoning, the government (but not the majority) supposes — without *any* supporting evidence — that the trucker may have, might have, or could have driven carelessly or aggressively. But as just explained, sheer speculation — which is all this really is (Darcy, for instance, never testified that the trucker drove improperly) — affords no basis for assuming that something that could have possibly occurred actually did occur. See Wardlow, 528 U.S. at 123-24; McGuire, 260 F.3d at 46; Espinoza, 490 F.3d at 48. See generally Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 398 (1st Cir. 2012) (stressing that

"[a]ssumptions are not a substitute for evidence"); Jane Doe No. 1 v. Backpage.com LLC, 817 F.3d 12, 25 (1st Cir. 2016) (warning about the folly of "pyramid[ing] speculative inference upon speculative inference").

Second, while the government (but not so much the majority) alludes to some hints in Darcy's testimony that he had a better vantage than his dashcam, the fact remains that he offered no (as in *zero*) facts showing the distance between Fagan's auto and the truck at the time of the lane switch — only conclusory characterizations of the vehicles being "too close," "close enough . . . that if the [truck] had to stop short it would have caused a collision, most likely," and there being "very little distance between the two." Critically as well, Darcy (recall) conceded that he could *not* estimate the distance between Fagan's car and the truck when Fagan passed in front of it. And he (recall also) conceded that he only saw Fagan's "whole vehicle for the first time" once he (Darcy) moved to the center lane following Fagan's return to the slow lane. As the party burdened with showing reasonable suspicion, the government had every incentive — and opportunity — to pin the separation distance down. That it could not speaks volumes.

Third, while the government (but not really the majority) makes much of the judge's remark that the dashcam video did "not contradict[]" Darcy's story, Darcy's concessions — his

not being able to estimate the distance between Fagan and the truck or Fagan's speed (after Fagan moved back to the slow lane), and his not seeing (at that critical juncture) the trucker flash his brake lights or take evasive action — undermine any suggestion of an unsafe lane change based on a near-crash cut off. See generally Anderson, 470 U.S. at 574 (telling appellate courts to confirm that the judge's findings are "*permissible*" or "*plausible* in light of the record viewed in its *entirety*" (emphases added)).

Fourth, while the government (but not the majority) implies that the dashcam video "corroborated" *all* of Darcy's unsafe-lane-change testimony because the footage supported his late-turn-signal claim, any such argument fails. First off, everyone knows — as a matter of legal logic and common sense — that a witness may be credible on some issues but not on others. See generally First Circuit Pattern Criminal Jury Instructions § 1.06 (making clear that when it comes to witness credibility, factfinders "may believe everything a witness says or *only part of it* or none of it" (emphasis added)); see also generally Peak v. United States, 353 U.S. 43, 46 (1957) (noting that "common sense often makes good law"). But the larger point is that while the video does confirm Darcy's claim of a late signal, it does not (as I keep saying) confirm his claim of a too-close lane change that resulted in an almost-crash episode. And neither does Darcy's

- 40 -

testimony read in its entirety, including most importantly his (much-discussed) concessions.

**(ii)**

This brings me back to the majority's central thesis (resembling the government's, and built on a hoped-for inference) that Fagan must've been "quite a bit closer than three to four car lengths when he began moving abruptly into the tractor-trailer's lane." Making what it thinks is a "[c]onservative[]" assumption that Fagan was going just 5 miles per hour faster than the trucker, the majority (as noted) uses this formula to show that there "could have been as little as between 9 and 24 feet" separating the vehicles when Fagan began the switch-back and so drove unsafely:

$$\frac{5\ miles}{hour} \times \frac{5280\ feet}{mile} \times \frac{hour}{3600\ seconds} \times 5\ seconds = 36.67\ feet\ closer$$

The majority gets between 9 and 24 feet by subtracting 36 feet from 45 to 60 feet.

"Garbage in, garbage out" is a concept familiar to mathematicians. It means (in less vivid terms) that a faulty input produces a faulty output. See *Garbage in, garbage out*, Wikipedia, https://en.wikipedia.org/wiki/Garbage_in,_garbage_out (last visited June 8, 2023). And the majority runs into that very problem — *i.e.,* the appearance of precision suggested by the majority's calculations is illusory, because bad info (which we

have here) assures a bad result, proving that a formula is only as good as the data behind it.

One of the majority's key assumptions is that Fagan could not have been 3 to 4 car lengths ahead of the trucker when he (Fagan) crossed the dashed-lane lines during the switch-back. Another is that the trucker's speed did not change as Fagan completed the merge. But why should anyone accept either assumption? Darcy offered no testimony and the judge made no finding on how far ahead of the trucker Fagan was as he crossed back into the trucker's lane. Ditto on how fast Fagan and the trucker were going during that critical time. So in the majority's fact-free world of conjecture (at least on the crucial questions), nothing would stop us from instead supposing that as Fagan crossed the dashed-lane lines separating the middle and slow lanes — after already being 45 to 60 feet ahead of the truck — the trucker then matched the 5-miles-per-hour increase.[12] Such an increase would

_____

[12] Interestingly, going by the standard broken-line-interstate-highway-measurement method, it seems like the distance at the point of Fagan's lane change was around 60 feet. See U.S. Dep't of Trans., Manual on Uniform Traffic Control Devices for Streets and Highways, Pt. 3, Ch. 3A, § 3A.06, Guidance 04 (2009) (explaining that each dashed-lane should be "10" feet long and "30" feet apart); see also Me. Dep't of Trans., Traffic Engineering Striping & Stenciling Handbook 4 (2019) (noting that a "[b]roken line pavement marking[] . . . is 10 foot long" and "separated by 30 foot long gaps," though "[o]n the freeway" it "would be . . . 15 feet long with 25 foot gaps").

cancel out Fagan's, changing the first numerator in the majority's equation from 5 miles to 0 miles:

$$\frac{0\ miles}{hour} \times \frac{5280\ feet}{mile} \times \frac{hour}{3600\ seconds} \times 5\ seconds = 0\ feet\ closer$$

That would turn the majority's 9 to 24 feet differential claim into a 45 to 60 feet differential claim. Which (in other words) would leave a 3 to 4 car length separation distance right after the switch-back — a distance not even the government says is *unsafe*.[13]

Next consider the majority's choice to use 5 seconds in its formula — *i.e.*, the time it took for the switch-back, from

_____

[13] Trying to refute these details, the majority (emphasis mine) calls the "possibility that Fagan did not maintain or even increase that greater speed *throughout* the lane change" "counter-intuitive." As if to drive that idea home, the majority (again emphasis mine) notes that the video "shows that Fagan's car was clearly going visibly faster than the tractor-trailer just *before* it began the lane change." I get that Fagan went faster than the trucker *before* the switch-back started (you'll get no argument from me on that). But I see nothing in the record showing that the trucker couldn't have sped up as Fagan crossed the dashed-lane lines. The majority also says that if the tractor-trailer had accelerated "when its driver saw Fagan in its lane," then "Fagan would still have been three to four car lengths ahead when Darcy got beside the tractor-trailer" — but, insists the majority, "the video plainly shows" that that did not happen. Yet Darcy himself agreed that when he got into the center lane with the truck in the immediate right lane, his dashcam "video" "show[ed]" Fagan "three or four car lengths in front of the tractor trailer." That the video (as the majority notes as well) then "shows Fagan moving away and quickly leaving enough space for Darcy's cruiser to pass in front of tractor-trailer" does not change my thinking either. Maybe Fagan sped up *after* Darcy spotted him 3 to 4 car lengths ahead of the trucker — or maybe (to continue operating in the majority's zone of speculation) the trucker (with a statie now coming up on his side) eased off the gas.

beginning to end.  The majority calls that "the relevant" period.

But what mattered to the judge (understandably, in my view) was

the "actual separation distance" once Fagan "returned" to the slow

lane "after passing the tractor-trailer."  On that score, the

uncontestedly safe distance of 3 to 4 car lengths came from Darcy's

testimony on how far ahead of the truck Fagan was "roughly a

second" after the switch-back.  And using 1 second rather than 5

seconds (*i.e.,* keying in on the 1 second period between when Fagan

completed the merge and when Darcy saw Fagan 3 to 4 car lengths in

front of the trucker), but still keeping the 5-miles-per-hour

assumption, gives us this:

$$\frac{5\ miles}{hour} \times \frac{5280\ feet}{mile} \times \frac{hour}{3600\ seconds} \times 1\ second\ = 7.33\ feet\ closer$$

That would put Fagan 7 feet closer to the trucker by the time he

(Fagan) completed the switch-back, leaving 38 to 53 feet (45 to 60

feet minus 7) between the two[14] — a distance not even the government

says is *unsafe*.

The  bottom  line  is  that  accepting  the  majority's

evidence-free 36-feet-closer theory (inspired in part by the

government) moves us far beyond reasonable inference and into the

_____

[14] That is a pretty big gap too.  It is a more than one but less than two average-sized telephone poles laid on the ground. (A typical telephone pole is about 30 feet high.  See Rich Vishneski, *Telephone Poles — The More You Know!*, DL Howell (Jan. 24, 2020), https://www.dlhowell.com/blog/telephone-poles (last visited June 8, 2023).)

forbidden realm of speculative imaginings.  See generally Ornelas

v. United States, 517 U.S. 690, 699 (1996) (holding that we must

"give due weight to inferences" from the "*facts*" of record

(emphasis added)).[15]  Maybe that is why the judge did not rely on

any must-have-been-even-closer theory in reaching his decision

(even though the government pushed that idea (or a variation of

it) below).[16]

## 2

Hyping the judge's comment that the video "appears" to

show an "abrupt" lane change, the government also reminds us that

a factfinder's choice among supportable views of the evidence

cannot be clearly erroneous — the government seems to be suggesting

that "abrupt" equals "unsafe" (the majority apparently agrees).

It should go without saying (though I will say it nonetheless)

---

[15] All that speculation shows just how wrong the majority is
to claim that "[t]he video bears twice on the issue of the speed
deferential."  The majority's claim is also out of place given how
the judge (emphases mine) twice found the video "*not* definitive
one way or the other" on the separation-distance issue — a finding
the majority says is "*not* . . . clearly erroneous."

[16] The majority is right that courts must "respect . . . the
ability of trained and experienced police officers to draw from
the attendant circumstances inferences that would 'elude an
untrained person.'"  United States v. Tiru-Plaza, 766 F.3d 111,
116 (1st Cir. 2014) (footnote omitted and quoting United States v.
Cortez, 499 U.S. 411, 418 (1981)).  But courts value inferences
drawn from the hard "*facts*," see id. at 117 (emphasis added and
quoting Terry, 392 U.S. at 27) — not (as we have here) speculative
suppositions on important issues (like the vehicles' relative
speeds).

that abrupt cannot *always* equal unsafe (think of an abrupt change with no cars in the return lane).  Anyway the key word here is *supportable — i.e.,* "anchored in probative *evidence*" on complete-record review.  See McGuire, 260 F.3d at 45 (emphasis added).  Darcy's reasonable-suspicion claim stands — or more accurately falls (as I've been saying) — on the notion that Fagan cut off the truck in a near-crash event.  But no one — not Darcy, not the judge, not the government, not this panel — knows the actual separation distance between Fagan's car and the truck or saw the truck's brake lights go on (I know I sound like a broken record, though necessarily so).  See id. at 45-46 (stamping a finding implausible after whole-record review, thus making the finding clearly erroneous).

**3**

Still hoping to rebut Fagan's points that Darcy could not see in front of the truck and did not know the distance between the vehicles, the government says none of that matters.  To the government's way of thinking (though not the majority's as far as I can tell), "[t]he existence . . . of some possibility" that Fagan violated no traffic law "does not nullify an officer's reasonable suspicion."  That is so — and here's the important part for its theory — because an officer "need not rule out the possibility of innocent conduct" to have reasonable suspicion (the quote comes from Arvizu, 534 U.S. at 277).  While deeply-rooted, the "need not

rule out" rule does not help the government in the least. An officer, after all, need not draw nonsuspicious inferences *if* sufficient facts *establish* reasonable suspicion. See, e.g., Arvizu, 534 U.S. at 277-78. So (once more) to get anywhere the government had to show that Darcy had an objective basis for reasonably suspecting that Fagan made an unsafe lane change. And (once more again) Darcy's concessions — his inability to fix the distance between Fagan and the truck or Fagan's speed (after Fagan switched back to the slow lane), and his not glimpsing (at that key period) the trucker brake or drive defensively — put that objective out of reach.

**4**

In something of a final push, the government — citing to a Maine high court opinion mentioned by the majority, Pooler v. Clifford, 639 A.2d 1061 (Me. 1994) — writes that Fagan's tardy turn signal should factor into a court's reasonable-suspicion analysis: Pooler interpreted Maine law as saying that sometimes a signal may be needed for safety reasons, sometimes not (the majority seems to embrace the government's argument, by the way). See id. at 1062. But

> it is not enough . . . for the district court
> to base its factual findings on *some* evidence
> in the record. The clear error standard
> authorizes us to reverse a finding, not
> unless, but "'*although* there is evidence to
> support it.'"

Latif v. Obama, 666 F.3d 746, 766 (D.C. Cir. 2011) (Henderson, J., concurring) (quoting Anderson, 470 U.S. at 573, in turn quoting U.S. Gypsum Co., 333 U.S. at 395) (emphases added by Judge Henderson). See generally Easley v. Cromartie, 532 U.S. 234, 257 (2001) (finding clear error even though "the record contains a *modicum of evidence* offering support for the District Court's conclusion" that a state legislature used race as the predominate factor in drawing a congressional district, because "[t]he evidence, *taken together*, . . . does not show that racial considerations predominated" (emphases added)). That crucial detail aside, Darcy (as the majority notes) offered *two* grounds for the pull over — the late signal and the cutting off of the truck in an almost-crash way. And a fair reading of the judge's order is that he pinned his reasonable-suspicion analysis on the second ground — a ground that is *not* "permissible" or "plausible" on *complete*-record review. See Anderson, 470 U.S. at 574. True, we may affirm a suppression order on any basis supported by the record. See United States v. McGregor, 650 F.3d 813, 824 (1st Cir. 2011). But the government offers no convincing reason to use Fagan's delayed signal in that way (indeed the government's brief does not even mention the affirm-on-any-ground rule).

## 5

The majority ends its reasonable-suspicion section by criticizing my focus on "Darcy's characterization of the lane

- 48 -

change as cutting off the tractor-trailer at so close a distance as to create an 'almost-crash situation.'"  Darcy's account — credited below, as the majority notes — shaped the judge's unsafe-lane-change finding from start to finish.  That account — which unquestionably alleged a near-crash scenario — made separation distance a major concern (as the judge said).  But (for the umpteenth time) neither he nor the judge could calculate that number.  And the majority's unfounded speculation — unfounded because no knows the actual separation distance, or for that matter the drivers' relative speeds — certainly cannot fill the hole (as I've also been at pains to say).  Which seems like a topic worthy of focus, given how reasonable suspicion requires us to consider "the whole picture," see Cortez, 449 U.S. at 417, so we do not miss the larger situation.

## V

All in all, the majority's position (based largely on the government's) is too long on guesses and too short on facts to sustain the judge's conclusion that a reasonable trooper in Darcy's shoes would have suspected that he had seen an unsafe lane change. So I would reverse the denial of Fagan's suppression motion, vacate his conviction and sentence, and remand for further proceedings.[17]

---

[17] Given my take on the stop issue, I need not (and so do not) discuss any of Fagan's other grounds for reversal — including claims that officers unlawfully prolonged the traffic stop and violated his Miranda rights, and that the judge wrongly denied

And I must respectfully — but emphatically — dissent from the majority's contrary holding.

some of his racial profiling-related discovery requests.  See <u>PDK Lab'ys Inc.</u> v. <u>U.S. D.E.A.</u>, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (declaring that "if it is not necessary to decide more, it is necessary not to decide more").